**Arthur D. HENDERSON, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, a corporation, Defendant.**

**No. 85 C 6692.**

United States District Court, N.D. Illinois, E.D.

July 29, 1986.

Martin R. Rothenberg, James W. Naisbitt, Martin R. Rothenberg Ltd., Allan G. Levine, Rothenberg & Levine, Chicago, Ill., for plaintiff.

David J. Carol, Theodore M. Kerrine, Nat. R.R. Passenger Corp., Washington, D.C., Michael Rosenblum, Donna Pannich, Mayer, Brown & Platt, Chicago, Ill., for defendant.

## ORDER

BUA, District Judge.

Before the Court are the plaintiff's motion to compel discovery and motion concerning Kelly Zanders. Pursuant to Fed.R. Civ.P. 37(a), the Court orders the defendant to comply with and answer certain of the plaintiff's discovery requests as set forth in the text of this opinion. The Court also allows communications with Kelly Zanders as governed by certain restrictions. For the reasons stated herein, the plaintiff's motions are granted in part and denied in part.

## I. FACTS

This dispute arises out of a claim of race discrimination on the part of the National Railroad Passenger Corporation (Amtrak) against a former train attendant, Arthur P. Henderson. Henderson is black and was a train attendant with Amtrak from 1974 to 1983. He claims that Amtrak discriminated against him on the basis of race when Amtrak terminated his employment on November 11, 1983. The termination followed a charge and formal investigation concerning an alleged "sleeping on duty" incident which occurred on October 14, 1983.

Henderson's disciplinary proceedings were performed under the direction of one hearing officer, Donald Staska. In April 1984, an Investigating Committee was formed to examine complaints concerning assessment of discipline in the Chicago Passenger Service Department ("CPSD"). Within six months of the plaintiff's termination, the special group of hearing examiners was established. Henderson seeks to gain information regarding the formation and practice of these two groups by expanding the scope of discovery to a five-year period including all six districts.

Ms. Kelly Zanders was employed by Amtrak as EEOC representative during the period including November 1983. Amtrak has objected to any private meeting between Zanders and plaintiff's attorney. Amtrak contends that the proposed communication is prohibited by a termination agreement. Plaintiff's counsel feels that Zanders has information relevant to Henderson's case. Amtrak asserts that

the validity of the termination agreement along with the attorney-client privilege precludes a private meeting between Zanders and the plaintiff's counsel.

On October 20, 1985, plaintiff served his first set of interrogatories and document requests on Amtrak. After an initial set of responses as well as numerous discussions, defendant served several sets of supplemental responses. Plaintiff's counsel again advised defendant's counsel that these responses were incomplete and that certain objections were asserted without justification. Despite sincere attempts to resolve differences, the parties were unable to reach an accord regarding certain of defendant's supplemented responses to the plaintiff's first set of interrogatories and first request for production of documents.

On March 7, 1986, Henderson made two motions: the first was to compel discovery regarding various interrogatories and document requests; the second was a motion concerning Zanders, ordering Amtrak to permit Zanders to meet and communicate privately with plaintiff's counsel without any restriction as to subject matter.

## II. DISCUSSION

### A. *Motion to Compel Discovery*

The plaintiff has requested an order compelling answers to certain interrogatories and production of document requests. Henderson claims that defendant has failed to answer within the meaning of the Federal Rules of Civil Procedure. Amtrak objects that the information sought to be discovered is irrelevant and unduly burdensome.

The scope of discovery is especially broad in Title VII cases. *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 343 (10th Cir.1975); *Burns v. Thiokol Chemical Corporation*, 483 F.2d 300, 305 (5th Cir. 1973). Once the plaintiff has requested discovery, Amtrak must comply or bear the burden of proving why the discovery requests are inappropriate. Discovery will not be compelled if the information sought to be discovered is irrelevant or burden-some. Amtrak must show that the discovery requests are unduly burdensome. *Board of Education of Evanston Township v. Admiral Heating*, 104 F.R.D. 23, 29 (N.D.Ill.1984). The Court will compel discovery if there is "any possibility that the information sought may be relevant to the subject matter of the action." *In re Folding Carton Antitrust Litigation*, 83 F.R.D. 251, 254 (N.D.Ill.1978) (citing 8 Wright & Miller, *Federal Practice and Procedure*, § 2008, at 46–47). Evidence of past discrimination may be relevant to show motive and intent as to a present practice. *United States v. International Association of Bridge, Structural, and Ornamental Iron Workers, Local No. 1*, 438 F.2d 679, 683 (7th Cir.1971).

Interrogatory 5(a) requests that, with respect to the investigation initiated by Amtrak and held in the matter of A.D. Henderson, Amtrak provide a description of all internal rules or procedure governing the request, institution, conduct, and evaluation of the results of the outcome of such investigation. In other words, plaintiff seeks to discover what procedures Amtrak has for monitoring and training hearing officers. The plaintiff believes centralized training procedures and guidelines govern the discipline process. If such procedures are centralized, the requested nationwide scope of discovery is appropriate.

Amtrak responded to plaintiff's request by asserting that the evaluation of results of investigations are solely in the discretion of the hearing officer. This response only addresses evaluation, the fourth step in the investigative process. Henderson requested information regarding the whole procedure from beginning to end, including request, institution, conduct and evaluation of disciplinary actions.

Any information about the investigative process as well as procedures, policies, and guidelines governing the training or monitoring of hearing officers is an integral part of the investigative process since the officers themselves play a central role. If Amtrak still contends that no centralized guidelines, regulations, or policies exist for

training the hearing officers, they must respond as such, by way of affidavit, within ten days.

■ Interrogatory 6(a)(b) and Document Request 8, seek all information and documents relating to the investigation of alleged employee violations of Rules of Conduct A, K, or L, for the period of January 1, 1980 to January 1, 1985 (i.e. name, nature of offense, outcome, and personal file transcript). This request attempts to expand the time frame and geographical scope to include a full five-year period and nationwide discovery.

Amtrak claims that the geographic scope should be limited to the location and specific work unit from which Henderson was terminated. Amtrak claims that further expansion of discovery before and after Staska's time as hearing officer will not lead to discovery of any evidence as to whether Staska discriminated against the plaintiff. Amtrak also believes that comparing treatment of employees disciplined for sleeping on the job at independent locations across the United States, including those regions with a lower number of black employees is irrelevant.

Henderson claims that Amtrak discriminated against him because of his race. He asserts a need for data beyond his own location and work unit in order to create a sufficient statistical base as evidence of Amtrak's discrimination against him. Limiting the geographical scope of discovery to the Chicago Passenger Service Department and the time to only those investigations conducted by Donald Staska, attempt to limit the plaintiff's cause of action and theory of discrimination. Amtrak's attempt, at this stage, to limit the theory of plaintiff's case and consequent need for proof is improper.

■ Statistical evidence is a valid form of evidence in a racial discrimination case. Henderson argues race discrimination. The plaintiff needs access to statistical data in order to prove that racial discrimination exists. Preventing the use of data from other regions because the percentage of black employees in those regions is low-

er, goes to the weight, not the relevancy of the evidence. Therefore, discovery will be permitted for the expanded geographical period, as well as the expanded time period for cases involving violations of Rules of Conduct A, K, or L.

■ Interrogatories 7(cc), 7(dd), and Document Request 9(a–c) ask for the identity of the members of the Chicago Committee, the identity of the special group of hearing examiners, and documents relating to both. The plaintiff states that discovery of the aforementioned data is directly relevant or calculated to lead to the discovery of relevant evidence. Henderson also contends that Amtrak has conceded that subsequent terminations are relevant by producing approximately ten cases occurring after the plaintiff's termination.

Defendant asserts that the identity and documents related to the Chicago Committee have been produced. Defendant also maintains that the identity of the hearing examiners is irrelevant since none of the hearing examiners heard or were in any way involved in the Henderson case. Defendant also contends that the report involving disciplinary cases, issued by the hearing examiners to the Special Committee investigating disciplinary procedures, is irrelevant.

The Court holds that, if something is wrong with the disciplinary or hearing procedures and creation of the Committee was intended to remedy this problem, then the background of the Committee's creation is clearly relevant. This background may show evidence of past discrimination by Amtrak. Evidence of past discrimination may be relevant to show motive and intent as to a present practice. *United States v. International Association of Bridge, Structural, and Ornamental Iron Workers, Local No. 1*, 438 F.2d 679, 683 (7th Cir.1971). Therefore, the plaintiff is allowed to access the names of the Committee, background on the creation of the Committee, and the Committee report. There is, however, no relevance to the Special Hearing Officers' names and addresses. The identity of the Special Hearing

Officers will be disclosed only if they heard cases in violation of Rules of Conduct A, K, or L.

■ In Document Request No. 15, the plaintiff seeks any documents submitted to or received by or from any person or government agency concerning Amtrak's Special Group or Committee as to any discrimination charges and the investigation of such charges. The defendant contends that all responsive documents were made available for the plaintiff's inspection in Washington, D.C., and a list of all nonresponsive documents was produced.

Amtrak has made its own determination regarding which documents it considers to be relevant to the plaintiff's case. Henderson disputes the contention that all relevant documents have been produced. The Court must rule on the side favoring greater discovery. Therefore, Amtrak is given two options. Either it must produce all documents requested by the plaintiff or Amtrak must, within ten days, submit a list of documents it refuses to produce and the reasons why it has not produced them. Amtrak may refuse production if the documents are privileged or irrelevant. If defendant states a document is privileged, the Court may require an *in camera* inspection to determine the validity of that privilege.

### B. *Motion Concerning Kelly Zanders*

The proposed meeting between Kelly Zanders and plaintiff's counsel raises two questions: (1) the enforceability of the termination agreement, and (2) the existence of an attorney-client privilege. Amtrak feels compelled to seek a protective order to prevent any discussion with Zanders. Defendant feels that Zanders has an obligation to protect confidential communications that occurred during her time with Amtrak and that she will fail to do so. Amtrak maintains that the primary question is not whether the agreement is enforceable, but whether information can be disclosed against Amtrak's objection.

Henderson argues that the restrictions in the termination agreement violate public policy, are vague, overbroad, and therefore unenforceable as a matter of law. Plaintiff also claims that the surrounding evidence of behavior indicates that Amtrak is trying to hide potentially relevant and damaging evidence.

■ The Court distinguishes between the termination agreement's enforceability against Zanders and against a third party. The agreement was entered into between Zanders and Amtrak. It is not necessary that the Court decide the validity and enforceability of the termination agreement with respect to Zanders and Amtrak. The Court's *in camera* inspection of the termination agreement looked to its enforceability with respect to Henderson as a third party. Enforcing the agreement against a third party by prohibiting communication with Zanders seriously impedes the plaintiff's discovery of all relevant information. Henderson would be prevented from fully developing his case by an agreement to which he was not a party. If the agreement were held enforceable against a third party, it would all but obviate relevant discovery in later cases. Employers could develop employment agreements, analogous to the termination agreement in the instant case, that would prohibit employees from playing any role in discovery as a condition of their employment. Therefore, the termination agreement is not enforceable against Henderson as a third party.

In addition to the termination agreement, Amtrak also asserts an attorney-client privilege to protect against plaintiff's counsel speaking with Zanders. Amtrak submits that disclosures made by employees and officials to Zanders during the course of her employment, concerning alleged employee discrimination, are subject to the attorney-client privilege. Amtrak maintains that Zanders is an agent of the law department. Amtrak claims that the attorney-client privilege applies to an agent where the agent is acting under the direction and control of an attorney. Amtrak relies heavily on *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) to expand the scope of the attorney-client privilege to include communications made by corporate personnel to

corporate counsel and their agents. Amtrak concedes that Zanders may disclose specific facts regarding Henderson's termination.

Henderson argues that defendant's interpretation of the attorney-client privilege is too broad. He claims that there are no specific details as to Zanders' role as an agent working under the control of an attorney. Plaintiff also distinguishes the case law cited by Amtrak as not applicable to past employees. Henderson claims that Amtrak never identifies a single official or employee with whom Zanders has had privileged communication.

Applying the attorney-client privilege to Zanders' role within Amtrak is not a straightforward task. Kelly Zanders cannot be seen solely as the attorney or as the client. Zanders acted as a hybrid between the two. Our analysis of the applicability of the attorney-client privilege must reflect this dual role.

■ In the first part of her job, Kelly Zanders acts as an attorney. In an EEOC investigation she received information from employees. She gathered and analyzed this data on behalf of the law department. Amtrak claims that Zanders, being an agent of the law department, acted on behalf of the attorneys and therefore was under an attorney-client privilege.

If Zanders is to be looked at as an attorney, one must examine the principal-agent relationship that links her to the law department. There are three fundamental requirements of agency. First, an agent must have the power to affect the legal relations of the principal and others. Next, the agent is a fiduciary who works on behalf of the principal and primarily for his benefit. Last, the principal has the right to control the conduct of the agent. *Westinghouse Elec. Corp. v. Rio Algom Ltd.*, 448 F.Supp. 1284, 1300–1303 (N.D.Ill.1978).

Only two of the three agency requirements are met in the Amtrak-Zanders relationship. Amtrak did have control over Zanders as an employer controls his employee. However, Zanders did not affect the legal relations of Amtrak or work for Amtrak's benefit. She talked with employees who had complaints against Amtrak and then reported to the law department. She had no say in what legal remedies were taken. Despite the fact that Zanders worked for the law department, she did not work for its benefit. In most cases, the information she obtained from employees was antagonistic to the interests of Amtrak. *Westinghouse Elec. Corp. v. Rio Algom Ltd.*, 448 F.Supp. at 1301–1303.

■ Even if Zanders did meet the requirements of agency, her role as an agent is not subject to the attorney-client privilege since the employees she spoke with had no expectation of privacy. When Amtrak employees spoke with Zanders, they knew that the information discussed would be given to the law department. Communications are not made in confidence when they are intended to be disclosed to a third party or statements are made in the presence of the third party. *United States v. Keplinger*, 776 F.2d 678, 700 (7th Cir.1985). All employees knew that information collected by Zanders would be given to the law department to aid in its investigation of discrimination complaints. When information is given to an attorney with the intent that the information will be conveyed to a third party, no confidentiality exists. *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir.1983).

The attorney-client privilege "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978). None of the information provided to Zanders indicates that any employees had a "manifest intention" to seek legal advice from her.

■ The second part of Zanders' role as EEOC investigator involved relaying the information obtained from employees to the law department. In this part of her work, Zanders acted as a client, conveying information to the attorney. However, use of the attorney-client privilege with Zanders in the client role also fails when analyzed.

Zanders, as a client, gives information to Amtrak attorneys about employee complaints. In no way does Zanders have a "manifest intention" to seek legal advice for herself or her fellow employees. By relaying information to Amtrak attorneys, Zanders provides advice or information upon which Amtrak develops a position with regards to specific discrimination complaints.

The defendant argues that, "if the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply." *City of Philadelphia v. Westinghouse Elec. Corp.*, 210 F.Supp. 483, 485 (E.D.Pa.1962). Zanders was not in the control group and she did not take a substantial part in a decision about Amtrak's handling of specific discrimination cases.

The defendant contends that the broadening of this control group by *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) would include Zanders. *Upjohn* holds that a privilege exists to protect not only the giving of professional advice to those who can act on it, but also giving information to lawyers to enable them to give sound and informed advice. Zanders gave information to Amtrak attorneys. However, this information, reporting on Amtrak's discrimination, was antagonistic to the interests of Amtrak. A member of the control group is an individual that has the ability to bind a party; a member of the corporation who can, by actions within the scope of his employment, involve the corporation in serious legal difficulties. *Upjohn Co. v. United States*, 449 U.S. at 384, 101 S.Ct. at 680. In *Massa v. Eaton Corp.*, 109 F.R.D. 312 (W.D.Mich.1985), the court applied *Upjohn*'s expanded control group test to prevent the use of communications with current managerial employees. Zanders, however, is no longer employed by Amtrak. She could not and cannot now bind Amtrak and is therefore not a part of this expanded control group developed in *Upjohn*.

The attorney-client privilege impedes full and free discovery and must be strictly construed. *Radiant Burners Inc. v. American Gas Association*, 320 F.2d 314, 322–323 (7th Cir.1963). Therefore, the Court orders that defendant permit Kelly Zanders to meet and communicate privately with the plaintiff's counsel without any restriction on subject matter or content. A protective order will issue limiting the use of any communication made by Zanders to plaintiff's attorney to this action. The Court also orders that a private meeting or communication between plaintiff's counsel and Zanders will not cause Zanders to be in violation of the termination agreement.

## III. CONCLUSION

For the reasons stated herein, plaintiff's motion to compel discovery is granted in part and denied in part. Plaintiff's motion concerning Kelly Zanders is granted and plaintiff's attorney is allowed to meet with her privately.

In addition, a protective order is issued, pursuant to Fed.R.Civ.P. 26(c), protecting against the use of Zanders' communications, except as related to and used in this action.

IT IS SO ORDERED.