# UPJOHN CO. ET AL. *v.* UNITED STATES ET AL.

No. 79–886.   Argued November 5, 1980—Decided January 13, 1981

384

REHNQUIST, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined, and in Parts I and III of which BURGER, C. J., joined. BURGER, C. J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 402.

*Daniel M. Gribbon* argued the cause and filed briefs for petitioners.

*Deputy Solicitor General Wallace* argued the cause for respondents. With him on the brief were *Solicitor General McCree, Assistant Attorney General Ferguson, Stuart A. Smith,* and *Robert E. Lindsay.**

---

*Briefs of *amici curiae* urging reversal were filed by *Leonard S. Janofsky, Leon Jaworski,* and *Keith A. Jones* for the American Bar Association; by *Thomas G. Lilly, Alfred F. Belcuore, Paul F. Rothstein,* and *Ronald L. Carlson* for the Federal Bar Association; by *Erwin N. Griswold* for the American College of Trial Lawyers et al.; by *Stanley T. Kaleczyc* and *J. Bruce Brown* for the Chamber of Commerce of the United States; and by *Lewis A. Kaplan, James N. Benedict, Brian D. Forrow, John G. Koeltl, Standish Forde Medina, Jr., Renee J. Roberts,* and *Marvin Wexler* for the Committee on Federal Courts et al.

*William W. Becker* filed a brief for the New England Legal Foundation as *amicus curiae.*

JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari in this case to address important questions concerning the scope of the attorney-client privilege in the corporate context and the applicability of the work-product doctrine in proceedings to enforce tax summonses. 445 U. S. 925. With respect to the privilege question the parties and various *amici* have described our task as one of choosing between two "tests" which have gained adherents in the courts of appeals. We are acutely aware, however, that we sit to decide concrete cases and not abstract propositions of law. We decline to lay down a broad rule or series of rules to govern all conceivable future questions in this area, even were we able to do so. We can and do, however, conclude that the attorney-client privilege protects the communications involved in this case from compelled disclosure and that the work-product doctrine does apply in tax summons enforcement proceedings.

I

Petitioner Upjohn Co. manufactures and sells pharmaceuticals here and abroad. In January 1976 independent accountants conducting an audit of one of Upjohn's foreign subsidiaries discovered that the subsidiary made payments to or for the benefit of foreign government officials in order to secure government business. The accountants so informed petitioner Mr. Gerard Thomas, Upjohn's Vice President, Secretary, and General Counsel. Thomas is a member of the Michigan and New York Bars, and has been Upjohn's General Counsel for 20 years. He consulted with outside counsel and R. T. Parfet, Jr., Upjohn's Chairman of the Board. It was decided that the company would conduct an internal investigation of what were termed "questionable payments." As part of this investigation the attorneys prepared a letter containing a questionnaire which was sent to "All Foreign General and Area Managers" over the Chairman's signature. The letter

began by noting recent disclosures that several American companies made "possibly illegal" payments to foreign government officials and emphasized that the management needed full information concerning any such payments made by Upjohn. The letter indicated that the Chairman had asked Thomas, identified as "the company's General Counsel," "to conduct an investigation for the purpose of determining the nature and magnitude of any payments made by the Upjohn Company or any of its subsidiaries to any employee or official of a foreign government." The questionnaire sought detailed information concerning such payments. Managers were instructed to treat the investigation as "highly confidential" and not to discuss it with anyone other than Upjohn employees who might be helpful in providing the requested information. Responses were to be sent directly to Thomas. Thomas and outside counsel also interviewed the recipients of the questionnaire and some 33 other Upjohn officers or employees as part of the investigation.

On March 26, 1976, the company voluntarily submitted a preliminary report to the Securities and Exchange Commission on Form 8–K disclosing certain questionable payments.[1] A copy of the report was simultaneously submitted to the Internal Revenue Service, which immediately began an investigation to determine the tax consequences of the payments. Special agents conducting the investigation were given lists by Upjohn of all those interviewed and all who had responded to the questionnaire. On November 23, 1976, the Service issued a summons pursuant to 26 U. S. C. § 7602 demanding production of:

> "All files relative to the investigation conducted under the supervision of Gerard Thomas to identify payments to employees of foreign governments and any political

---

[1] On July 28, 1976, the company filed an amendment to this report disclosing further payments.

contributions made by the Upjohn Company or any of its affiliates since January 1, 1971 and to determine whether any funds of the Upjohn Company had been improperly accounted for on the corporate books during the same period.

"The records should include but not be limited to written questionnaires sent to managers of the Upjohn Company's foreign affiliates, and memorandums or notes of the interviews conducted in the United States and abroad with officers and employees of the Upjohn Company and its subsidiaries." App. 17a–18a.

The company declined to produce the documents specified in the second paragraph on the grounds that they were protected from disclosure by the attorney-client privilege and constituted the work product of attorneys prepared in anticipation of litigation. On August 31, 1977, the United States filed a petition seeking enforcement of the summons under 26 U. S. C. §§ 7402 (b) and 7604 (a) in the United States District Court for the Western District of Michigan. That court adopted the recommendation of a Magistrate who concluded that the summons should be enforced. Petitioners appealed to the Court of Appeals for the Sixth Circuit which rejected the Magistrate's finding of a waiver of the attorney-client privilege, 600 F. 2d 1223, 1227, n. 12, but agreed that the privilege did not apply "[t]o the extent that the communications were made by officers and agents not responsible for directing Upjohn's actions in response to legal advice . . . for the simple reason that the communications were not the 'client's.'" Id., at 1225. The court reasoned that accepting petitioners' claim for a broader application of the privilege would encourage upper-echelon management to ignore unpleasant facts and create too broad a "zone of silence." Noting that Upjohn's counsel had interviewed officials such as the Chairman and President, the Court of Appeals remanded to the District Court so that a determination of who was

within the "control group" could be made. In a concluding footnote the court stated that the work-product doctrine "is not applicable to administrative summonses issued under 26 U. S. C. § 7602." *Id.,* at 1228, n. 13.

## II

Federal Rule of Evidence 501 provides that "the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961). Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client. As we stated last Term in *Trammel* v. *United States,* 445 U. S. 40, 51 (1980): "The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." And in *Fisher* v. *United States,* 425 U. S. 391, 403 (1976), we recognized the purpose of the privilege to be "to encourage clients to make full disclosure to their attorneys." This rationale for the privilege has long been recognized by the Court, see *Hunt* v. *Blackburn,* 128 U. S. 464, 470 (1888) (privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure"). Admittedly complications in the application of the privilege arise when the client is a corporation, which in theory is an artificial creature of the

law, and not an individual; but this Court has assumed that the privilege applies when the client is a corporation, *United States* v. *Louisville & Nashville R. Co.,* 236 U. S. 318, 336 (1915), and the Government does not contest the general proposition.

The Court of Appeals, however, considered the application of the privilege in the corporate context to present a "different problem," since the client was an inanimate entity and "only the senior management, guiding and integrating the several operations, . . . can be said to possess an identity analogous to the corporation as a whole." 600 F. 2d, at 1226. The first case to articulate the so-called "control group test" adopted by the court below, *Philadelphia* v. *Westinghouse Electric Corp.,* 210 F. Supp. 483, 485 (ED Pa.), petition for mandamus and prohibition denied *sub nom. General Electric Co.* v. *Kirkpatrick,* 312 F. 2d 742 (CA3 1962), cert. denied, 372 U. S. 943 (1963), reflected a similar conceptual approach:

> "Keeping in mind that the question is, Is it the corporation which is seeking the lawyer's advice when the asserted privileged communication is made?, the most satisfactory solution, I think, is that if the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, . . . then, in effect, *he is (or personifies) the corporation* when he makes his disclosure to the lawyer and the privilege would apply." (Emphasis supplied.)

Such a view, we think, overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice. See *Trammel, supra,* at 51; *Fisher, supra,* at 403. The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts

with an eye to the legally relevant. See ABA Code of Professional Responsibility, Ethical Consideration 4–1:

> "A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance."

See also *Hickman* v. *Taylor*, 329 U. S. 495, 511 (1947).

In the case of the individual client the provider of information and the person who acts on the lawyer's advice are one and the same. In the corporate context, however, it will frequently be employees beyond the control group as defined by the court below—"officers and agents . . . responsible for directing [the company's] actions in response to legal advice"—who will possess the information needed by the corporation's lawyers. Middle-level—and indeed lower-level—employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties. This fact was noted in *Diversified Industries, Inc.* v. *Meredith*, 572 F. 2d 596 (CA8 1978) (en banc):

> "In a corporation, it may be necessary to glean information relevant to a legal problem from middle management or non-management personnel as well as from top executives. The attorney dealing with a complex legal problem 'is thus faced with a "Hobson's choice". If he interviews employees not having "the very highest au-

thority", their communications to him will not be privileged. If, on the other hand, he interviews *only* those employees with "the very highest authority", he may find it extremely difficult, if not impossible, to determine what happened.' " *Id.*, at 608–609 (quoting Weinschel, Corporate Employee Interviews and the Attorney-Client Privilege, 12 B. C. Ind. & Com. L. Rev. 873, 876 (1971)).

The control group test adopted by the court below thus frustrates the very purpose of the privilege by discouraging the communication of relevant information by employees of the client to attorneys seeking to render legal advice to the client corporation. The attorney's advice will also frequently be more significant to noncontrol group members than to those who officially sanction the advice, and the control group test makes it more difficult to convey full and frank legal advice to the employees who will put into effect the client corporation's policy. See, *e. g., Duplan Corp.* v. *Deering Milliken, Inc.*, 397 F. Supp. 1146, 1164 (SC 1974) ("After the lawyer forms his or her opinion, it is of no immediate benefit to the Chairman of the Board or the President. It must be given to the corporate personnel who will apply it").

The narrow scope given the attorney-client privilege by the court below not only makes it difficult for corporate attorneys to formulate sound advice when their client is faced with a specific legal problem but also threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law. In light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, "constantly go to lawyers to find out how to obey the law," Burnham, The Attorney-Client Privilege in the Corporate Arena, 24 Bus. Law. 901, 913 (1969), particularly since compliance with the law in this area is hardly an instinctive matter, see, *e. g., United States* v. *United States Gypsum Co.*, 438 U. S. 422, 440–441 (1978) ("the behavior proscribed by the [Sherman] Act is

often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct").[2] The test adopted by the court below is difficult to apply in practice, though no abstractly formulated and unvarying "test" will necessarily enable courts to decide questions such as this with mathematical precision. But if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all. The very terms of the test adopted by the court below suggest the unpredictability of its application. The test restricts the availability of the privilege to those officers who play a "substantial role" in deciding and directing a corporation's legal response. Disparate decisions in cases applying this test illustrate its unpredictability. Compare, e. g., Hogan v. Zletz, 43 F. R. D. 308, 315–316 (ND Okla. 1967), aff'd in part sub nom. Natta v. Hogan, 392 F. 2d 686 (CA10 1968) (control group includes managers and assistant managers of patent division and research and development department), with Congoleum Industries, Inc. v. GAF Corp., 49 F. R. D. 82, 83–85 (ED Pa. 1969), aff'd, 478 F. 2d 1398 (CA3 1973) (control group includes only division and corporate vice presidents, and not two directors of research and vice president for production and research).

---

[2] The Government argues that the risk of civil or criminal liability suffices to ensure that corporations will seek legal advice in the absence of the protection of the privilege. This response ignores the fact that the depth and quality of any investigations to ensure compliance with the law would suffer, even were they undertaken. The response also proves too much, since it applies to all communications covered by the privilege: an individual trying to comply with the law or faced with a legal problem also has strong incentive to disclose information to his lawyer, yet the common law has recognized the value of the privilege in further facilitating communications.

The communications at issue were made by Upjohn employees[3] to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel. As the Magistrate found, "Mr. Thomas consulted with the Chairman of the Board and outside counsel and thereafter conducted a factual investigation to determine the nature and extent of the questionable payments *and to be in a position to give legal advice to the company with respect to the payments.*" (Emphasis supplied.) 78-1 USTC ¶ 9277, pp. 83,598, 83,599. Information, not available from upper-echelon management, was needed to supply a basis for legal advice concerning compliance with securities and tax laws, foreign laws, currency regulations, duties to shareholders, and potential litigation in each of these areas.[4] The communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice. The questionnaire identified Thomas as "the company's General Counsel" and referred in its opening sentence to the possible illegality of payments such as the ones on which information was sought. App. 40a. A statement of policy accompanying the questionnaire clearly indicated the legal implications of the investigation. The policy statement was issued "in order that there be no uncertainty in the future as to the policy with respect to the practices which are the subject of this investiga-

[3] Seven of the eighty-six employees interviewed by counsel had terminated their employment with Upjohn at the time of the interview. App. 33a–38a. Petitioners argue that the privilege should nonetheless apply to communications by these former employees concerning activities during their period of employment. Neither the District Court nor the Court of Appeals had occasion to address this issue, and we decline to decide it without the benefit of treatment below.

[4] See *id.*, at 26a–27a, 103a, 123a–124a. See also *In re Grand Jury Investigation,* 599 F. 2d 1224, 1229 (CA3 1979); *In re Grand Jury Subpoena,* 599 F. 2d 504, 511 (CA2 1979).

tion." It began "Upjohn will comply with all laws and regulations," and stated that commissions or payments "will not be used as a subterfuge for bribes or illegal payments" and that all payments must be "proper and legal." Any future agreements with foreign distributors or agents were to be approved "by a company attorney" and any questions concerning the policy were to be referred "to the company's General Counsel." *Id.*, at 165a–166a. This statement was issued to Upjohn employees worldwide, so that even those interviewees not receiving a questionnaire were aware of the legal implications of the interviews. Pursuant to explicit instructions from the Chairman of the Board, the communications were considered "highly confidential" when made, *id.*, at 39a, 43a, and have been kept confidential by the company.[5] Consistent with the underlying purposes of the attorney-client privilege, these communications must be protected against compelled disclosure.

The Court of Appeals declined to extend the attorney-client privilege beyond the limits of the control group test for fear that doing so would entail severe burdens on discovery and create a broad "zone of silence" over corporate affairs. Application of the attorney-client privilege to communications such as those involved here, however, puts the adversary in no worse position than if the communications had never taken place. The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney:

> "[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely differ-

---

[5] See Magistrate's opinion, 78–1 USTC ¶ 9277, p. 83,599: "The responses to the questionnaires and the notes of the interviews have been treated as confidential material and have not been disclosed to anyone except Mr. Thomas and outside counsel."

ent thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Philadelphia* v. *Westinghouse Electric Corp.,* 205 F. Supp. 830, 831 (ED Pa. 1962).

See also *Diversified Industries,* 572 F. 2d, at 611; *State ex rel. Dudek* v. *Circuit Court,* 34 Wis. 2d 559, 580, 150 N. W. 2d 387, 399 (1967) ("the courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer"). Here the Government was free to question the employees who communicated with Thomas and outside counsel. Upjohn has provided the IRS with a list of such employees, and the IRS has already interviewed some 25 of them. While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the policies served by the attorney-client privilege. As Justice Jackson noted in his concurring opinion in *Hickman* v. *Taylor,* 329 U. S., at 516: "Discovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary."

Needless to say, we decide only the case before us, and do not undertake to draft a set of rules which should govern challenges to investigatory subpoenas. Any such approach would violate the spirit of Federal Rule of Evidence 501. See S. Rep. No. 93–1277, p. 13 (1974) ("the recognition of a privilege based on a confidential relationship . . . should be determined on a case-by-case basis"); *Trammel,* 445 U. S., at 47; *United States* v. *Gillock,* 445 U. S. 360, 367 (1980). While such a "case-by-case" basis may to some slight extent undermine desirable certainty in the boundaries of the attor-

ney-client privilege, it obeys the spirit of the Rules. At the same time we conclude that the narrow "control group test" sanctioned by the Court of Appeals in this case cannot, consistent with "the principles of the common law as . . . interpreted . . . in the light of reason and experience," Fed. Rule Evid. 501, govern the development of the law in this area.

## III

Our decision that the communications by Upjohn employees to counsel are covered by the attorney-client privilege disposes of the case so far as the responses to the questionnaires and any notes reflecting responses to interview questions are concerned. The summons reaches further, however, and Thomas has testified that his notes and memoranda of interviews go beyond recording responses to his questions. App. 27a–28a, 91a–93a. To the extent that the material subject to the summons is not protected by the attorney-client privilege as disclosing communications between an employee and counsel, we must reach the ruling by the Court of Appeals that the work-product doctrine does not apply to summonses issued under 26 U. S. C. § 7602.[6]

The Government concedes, wisely, that the Court of Appeals erred and that the work-product doctrine does apply to IRS summonses. Brief for Respondents 16, 48. This doctrine was announced by the Court over 30 years ago in *Hickman* v. *Taylor*, 329 U. S. 495 (1947). In that case the Court rejected "an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties." *Id.*, at 510. The Court noted that "it is essential that a lawyer work with

---

[6] The following discussion will also be relevant to counsel's notes and memoranda of interviews with the seven former employees should it be determined that the attorney-client privilege does not apply to them. See n. 3, *supra.*

a certain degree of privacy" and reasoned that if discovery of the material sought were permitted

> "much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop·in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." *Id.,* at 511.

The "strong public policy" underlying the work-product doctrine was reaffirmed recently in *United States* v. *Nobles,* 422 U. S. 225, 236–240 (1975), and has been substantially incorporated in Federal Rule of Civil Procedure 26 (b)(3).[7]

As we stated last Term, the obligation imposed by a tax summons remains "subject to the traditional privileges and limitations." *United States* v. *Euge,* 444 U. S. 707, 714 (1980). Nothing in the language of the IRS summons provisions or their legislative history suggests an intent on the part of Congress to preclude application of the work-product doctrine. Rule 26 (b)(3) codifies the work-product doctrine, and the Federal Rules of Civil Procedure are made applicable

---

[7] This provides, in pertinent part:

"[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

to summons enforcement proceedings by Rule 81 (a)(3). See *Donaldson* v. *United States,* 400 U. S. 517, 528 (1971). While conceding the applicability of the work-product doctrine, the Government asserts that it has made a sufficient showing of necessity to overcome its protections. The Magistrate apparently so found, 78–1 USTC ¶ 9277, p. 83,605. The Government relies on the following language in *Hickman:*

> "We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and nonprivileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. . . . And production might be justified where the witnesses are no longer available or can be reached only with difficulty." 329 U. S., at 511.

The Government stresses that interviewees are scattered across the globe and that Upjohn has forbidden its employees to answer questions it considers irrelevant. The above-quoted language from *Hickman,* however, did not apply to "oral statements made by witnesses . . . whether presently in the form of [the attorney's] mental impressions or memoranda." *Id.,* at 512. As to such material the Court did "not believe that any showing of necessity can be made under the circumstances of this case so as to justify production. . . . If there should be a rare situation justifying production of these matters, petitioner's case is not of that type." *Id.,* at 512–513. See also *Nobles, supra,* at 252–253 (WHITE, J., concurring). Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes, 329 U. S., at 513 ("what he saw fit to write down regarding witnesses' remarks"); *id.,* at 516–517 ("the statement would be his [the

attorney's] language, permeated with his inferences") (Jackson, J., concurring).[8]

Rule 26 accords special protection to work product revealing the attorney's mental processes. The Rule permits disclosure of documents and tangible things constituting attorney work product upon a showing of substantial need and inability to obtain the equivalent without undue hardship. This was the standard applied by the Magistrate, 78–1 USTC ¶ 9277, p. 83,604. Rule 26 goes on, however, to state that "[i]n ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation." Although this language does not specifically refer to memoranda based on oral statements of witnesses, the *Hickman* court stressed the danger that compelled disclosure of such memoranda would reveal the attorney's mental processes. It is clear that this is the sort of material the draftsmen of the Rule had in mind as deserving special protection. See Notes of Advisory Committee on 1970 Amendment to Rules, 28 U. S. C. App., p. 442 ("The subdivision . . . goes on to protect against disclosure the mental impressions, conclusions, opinions, or legal theories . . . of an attorney or other representative of a party. The *Hickman* opinion drew special attention to the need for protecting an attorney against discovery of memoranda prepared from recollection of oral interviews. The courts have steadfastly safeguarded against disclosure of lawyers' mental impressions and legal theories . . .").

---

[8] Thomas described his notes of the interviews as containing "what I considered to be the important questions, the substance of the responses to them, my beliefs as to the importance of these, my beliefs as to how they related to the inquiry, my thoughts as to how they related to other questions. In some instances they might even suggest other questions that I would have to ask or things that I needed to find elsewhere." 78–1 USTC ¶ 9277, p. 83,599.

Based on the foregoing, some courts have concluded that *no* showing of necessity can overcome protection of work product which is based on oral statements from witnesses. See, *e. g., In re Grand Jury Proceedings,* 473 F. 2d 840, 848 (CA8 1973) (personal recollections, notes, and memoranda pertaining to conversation with witnesses); *In re Grand Jury Investigation,* 412 F. Supp. 943, 949 (ED Pa. 1976) (notes of conversation with witness "are so much a product of the lawyer's thinking and so little probative of the witness's actual words that they are absolutely protected from disclosure"). Those courts declining to adopt an absolute rule have nonetheless recognized that such material is entitled to special protection. See, *e. g., In re Grand Jury Investigation,* 599 F. 2d 1224, 1231 (CA3 1979) ("special considerations . . . must shape any ruling on the discoverability of interview memoranda . . . ; such documents will be discoverable only in a 'rare situation' "); cf. *In re Grand Jury Subpoena,* 599 F. 2d 504, 511–512 (CA2 1979).

We do not decide the issue at this time. It is clear that the Magistrate applied the wrong standard when he concluded that the Government had made a sufficient showing of necessity to overcome the protections of the work-product doctrine. The Magistrate applied the "substantial need" and "without undue hardship" standard articulated in the first part of Rule 26 (b)(3). The notes and memoranda sought by the Government here, however, are work product based on oral statements. If they reveal communications, they are, in this case, protected by the attorney-client privilege. To the extent they do not reveal communications, they reveal the attorneys' mental processes in evaluating the communications. As Rule 26 and *Hickman* make clear, such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship.

While we are not prepared at this juncture to say that such material is always protected by the work-product rule, we

think a far stronger showing of necessity and unavailability by other means than was made by the Government or applied by the Magistrate in this case would be necessary to compel disclosure. Since the Court of Appeals thought that the work-product protection was never applicable in an enforcement proceeding such as this, and since the Magistrate whose recommendations the District Court adopted applied too lenient a standard of protection, we think the best procedure with respect to this aspect of the case would be to reverse the judgment of the Court of Appeals for the Sixth Circuit and remand the case to it for such further proceedings in connection with the work-product claim as are consistent with this opinion.

Accordingly, the judgment of the Court of Appeals is reversed, and the case remanded for further proceedings.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring in part and concurring in the judgment.

I join in Parts I and III of the opinion of the Court and in the judgment. As to Part II, I agree fully with the Court's rejection of the so-called "control group" test, its reasons for doing so, and its ultimate holding that the communications at issue are privileged. As the Court states, however, "if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected." *Ante,* at 393. For this very reason, I believe that we should articulate a standard that will govern similar cases and afford guidance to corporations, counsel advising them, and federal courts.

The Court properly relies on a variety of factors in concluding that the communications now before us are privileged. See *ante,* at 394–395. Because of the great importance of the issue, in my view the Court should make clear now that, as a

general rule, a communication is privileged at least when, as here, an employee or former employee speaks at the direction of the management with an attorney regarding conduct or proposed conduct within the scope of employment. The attorney must be one authorized by the management to inquire into the subject and must be seeking information to assist counsel in performing any of the following functions: (a) evaluating whether the employee's conduct has bound or would bind the corporation; (b) assessing the legal consequences, if any, of that conduct; or (c) formulating appropriate legal responses to actions that have been or may be taken by others with regard to that conduct. See, e. g., Diversified Industries, Inc. v. Meredith, 572 F. 2d 596, 609 (CA8 1978) (en banc); Harper & Row Publishers, Inc. v. Decker, 423 F. 2d 487, 491–492 (CA7 1970), aff'd by an equally divided Court, 400 U. S. 348 (1971); Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1163–1165 (SC 1974). Other communications between employees and corporate counsel may indeed be privileged—as the petitioners and several amici have suggested in their proposed formulations*—but the need for certainty does not compel us now to prescribe all the details of the privilege in this case.

Nevertheless, to say we should not reach all facets of the privilege does not mean that we should neglect our duty to provide guidance in a case that squarely presents the question in a traditional adversary context. Indeed, because Federal Rule of Evidence 501 provides that the law of privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience," this Court has a special duty to clarify aspects of the law of privileges properly

---

*See Brief for Petitioners 21–23, and n. 25; Brief for American Bar Association as Amicus Curiae 5–6, and n. 2; Brief for American College of Trial Lawyers and 33 Law Firms as Amici Curiae 9–10, and n. 5.

before us. Simply asserting that this failure "may to some slight extent undermine desirable certainty," *ante,* at 396, neither minimizes the consequences of continuing uncertainty and confusion nor harmonizes the inherent dissonance of acknowledging that uncertainty while declining to clarify it within the frame of issues presented.