Iris **MITZNER**, Plaintiff,

v.

Dr. Thomas **SOBOL**, Dr. Charles Chew, Dr. Richard Nealon, Brenda Haas, David McLain, Bruce Cullen, Alanna Smith, J. Kenneth Magee, James F. English, and the Goshen Central School District, Defendants.

No. 90 Civ. 2379 (VLB).

United States District Court, S.D. New York.

April 8, 1991.

John S. McBride, Robert N. Isseks, Goshen, N.Y., for plaintiff.

Gary Greenwald, Goshen, N.Y., for Nealon, Haas, McClain, Cullen, Smith, Magee, English and Goshen C. School.

Robert Abrams, Atty. Gen., New York City, for Sobol and Chew.

## ORDER

JOEL J. TYLER, United States Magistrate Judge.

## BACKGROUND

For a factual background and procedural history, we refer to our Report and Recommendation, 90 Civ 2379 (VLB), filed September 5, 1990, familiarity with which is assumed. Since the date of that Report, discovery has been proceeding under our direction. The instant matter concerns certain discovery requests and deposition questions, from which defendants seek a protective order based on their assertion of attorney-client privilege. The primary document at issue is a Memorandum, dated January 20, 1989, from Robert E. Diaz, then State Education Department's General Counsel, to Lionel Meno, a Department Official. The document was drafted by Charles E. O'Brien, an attorney in the State Education Department Office of Counsel and concerns "allegations made by Iris and Bernard Mitzner of improprieties in the Spring 1988 fifth grade writing test at Goshen Central School." The Memorandum is headed with the following conspicuous label: "PRIVILEGED AND CONFIDENTIAL ATTORNEYS WORK PRODUCT" and has been submitted to the court for *in camera* inspection.

## ATTORNEY–CLIENT PRIVILEGE

■ In *Upjohn*, the Supreme Court broadened the scope of the attorney client privilege to include communications between employees of a corporation and corporate counsel. *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

> We decline to lay down a broad rule or series of rules to govern all conceivable future questions in this area, even were we able to do so. We can and do, however, conclude that the attorney-client privilege protects the communications involved in this case from compelled disclosure and that the work-product doctrine does apply in tax summons enforcement proceedings.

*Id.* at 386, 101 S.Ct. at 681.

The scope of the holding in *Upjohn*, with respect to the attorney-client privilege, is, thus, expressly limited to employees "responses to questionnaires and any notes reflecting responses to interview questions...." *Id.*, 101 S.Ct. at 686. On the other hand the Court recognized that an uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all. Our task is to determine whether *Upjohn* applies in the instant case and, if so, whether any exceptions to the rule apply. *Id.* at 393, 101 S.Ct. at 684.

Defendants contend that *Upjohn* applies to the instant situation and propose an analogy between the state educational hierarchy and a corporation. If we adopt, *arguendo*, defendants' analogy, *Upjohn* is not necessarily dispositive of the issues raised in the instant case. The Court did not address the following relevant questions in *Upjohn*:

1) Whether litigation between the corporation entity and an employee waives the attorney client privilege, particularly

if the employee is a "whistleblower" and merely one of many employees whose communications to counsel, relevant to the whistleblowing and ensuing investigative report, are at issue.

2) Whether the work-product rule should apply to an investigative report prepared as the result of a whistleblower's complaint, where the only possible litigation reasonably anticipated, at the time, were retaliatory proceedings brought to discipline the whistleblower, and where the instant civil rights litigation is a direct result of those disciplinary proceedings. In such a case, the work-product can not be said to have been prepared in anticipation of the litigation now in progress and the investigative report is the only direct evidence of certain conduct of the supervisors who brought or condoned the alleged retaliatory disciplinary proceedings.

By broadening the scope of both the attorney-client privilege and protection for work-product utilizing employee communications, the Court has necessarily broadened the potential for waiver of the privilege in litigation involving the corporation, or analogous entity, and those persons included within the broadened scope. In other words, in certain contexts, the employees, i.e., agents of the corporation, are collectively the "client"; corporate counsel, also an agent of the corporation, is the attorney. Once the corporation brings proceedings against an employee there is an adversarial relationship between this fictional "client" and "attorney". It is, of course, a basic principal of the common law of privilege that litigation between the client and the attorney waives the privilege.

Continuing with the corporate analogy in the instant case, however, the employee against whom action was taken and who is, hence, now suing the corporation, is not one of the employees from whom information was gathered for the preparation of the interim report relevant to the proceedings; however, her information was the impetus for the investigation and is necessarily a part of the interim report. The particular communication of one employee to corporate counsel is not at issue but, rather, the accumulated information gathered from the "client" group of which that person is, otherwise treated as a member.

The question of waiver is, thus, not a simple one. But are we to permit the employees, as a group, to be treated as the "client" so that the privilege can be used as a shield to protect, from third party adversaries, the corporate entity and all those within the broad definition of "client", as a commonly interested group, and then permit the corporation to single out one member of that same group, when the information—gathered as part of an internal investigation—is ultimately used for a purpose adverse to that member. The expanded privilege is there used as a sword, if not a knife in the back. A fundamental unfairness and double standard seems to emerge from these circumstances.

When this hypothetical corporate environment is superimposed on the background of a state's educational hierarchy, public policy and public interest in education, and in those responsible for administering it, certainly adds no weight to the argument for nondisclosure. This is not to say that a strong public interest can overcome the absolute attorney-client privilege but, rather, that there is no public interest or policy reason to justify the above-described double standard and unfairness. "The policy of privilege is to protect confidential attorney-client relationships only to the extent that the injury the relationship would suffer is greater than the benefit to be gained thereby." *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975) (*quoting* 8 Wigmore, sec. 2285 at 527). As the scope of the privilege has been broadened, so must be the scope of the circumstances constituting waiver of the privilege. Fortunately, this is not a case of first impression and analogous cases exist to instruct us on the common law of privilege.

Federal courts have held that the filing of suit, by the party asserting a privilege, or an affirmative act, which places the privileged information or communications at issue, waives the privilege so as to allow opposing party access to information for her defense. *Hearn, supra,* 68 F.R.D. 574 (State prison officials were deemed "clients" for purposes of privileged commu-

nications with attorney general regarding subject of civil rights suit).

The factors common to each exception [to the rules of privilege] may be summarized as follows: (1) Assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus where these three conditions exist, a court should find that the party asserting the privilege has impliedly waived it through his own affirmative conduct.

*Id.* at 581.

Here the party asserting the privilege is the defendant in the lawsuit. The waiver doctrine still applies however because defendants raise the affirmative defense of qualified immunity, thus placing this relevant information at issue. *See* Answer, filed May 2, 1990, Affirmative Defense "8", at 17.[1] Furthermore, the defendants initiated disciplinary action against plaintiff, which is the underlying basis for the present civil rights suit. The privilege has thus been clearly and repeatedly waived. *Id.* at 581–582.

Therefore, all the elements common to a finding of waiver are present in this case; defendants invoked the privilege in furtherance of an affirmative defense they asserted for their own benefit; through this affirmative act they placed the protected information at issue, for the legal advice they received is germane to the qualified immunity defense raised.

*Id.*

### WORK–PRODUCT

■ In *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court "rejected 'an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties.' " *Upjohn, supra,* 449 U.S. at 397, 101 S.Ct. at 686. Such material is not absolutely privileged but may be disclosed upon a showing of necessity.

Without deciding the question, the Supreme Court, in *Upjohn,* acknowledged that "a stronger showing of necessity and unavailability by other means is required" in order to obtain work-product consisting of an attorney's evaluation of attorney-client communications, which themselves are privileged. *Upjohn, supra,* 449 U.S. at 401–402, 101 S.Ct. at 688–689. The interim report at issue is just such attorney work-product. As determined above, however, the attorney-client privilege has been waived. The only area of further concern is the area of pure attorney work-product, i.e., documents revealing the thought processes and analyses of attorneys made in the course of preparing for litigation. Since "the first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant" the interim report necessarily involves some work-product. *Id.,* 101 S.Ct. at 683. At the same time neither the work-product rule nor attorney-client privilege protects against the disclosure of the underlying facts by those who communicated with the attorney. *Id.* at 685.

We find that the same policy reasons for excepting the communications underlying the report from the attorney-client privilege apply with respect to work product. The affirmative defense of qualified immunity places not only the investigation itself at issue but the advice given to the supervisory persons named as defendants. We find nothing in the interim report, examined *in camera,* that would jeopardize the

---

1. Defendants Sobel and Chew had neglected to file an Answer after our Report recommending denial of their Motion to Dismiss the Complaint was adopted by the Honorable Vincent L. Broderick on February 14, 1991. Assistant Attorney General Clement J. Collucci responded promptly to our direction that an Answer be immediately filed before the pending depositions of defendants. A copy of the Answer of defendants Sobel and Chew was received in our chambers by facsimile machine on April 2, 1991. The Answer includes the Affirmative Defense of qualified privilege at paragraph 95.

future of the attorney-client relationship or the integrity of future confidential communications; nor would disclosure of the report constitute a shifting of plaintiff's responsibility for her own discovery and investigation. Plaintiff must discover precisely what defendants learned and when they learned it; an independent investigatory effort would not yield reliable evidence of defendants' knowledge. In that respect, the information in the report is unavailable from another source and necessary for the prosecution of the action.

The defendants are hereby ordered to produce the Interim Report and any other documents pertaining to communications between defendants and counsel regarding the original Mitzner complaints and ensuing investigation and proceedings. All objections to questions concerning said subject matter are overruled and will not be sustained at future depositions.

SO ORDERED.