Connolly, Thomas E.,
J. This case arises from the suicide death of Julia Miles Carpenter (“Julia”) while she was a student at the Massachusetts Institute of Technology (“MIT’). Plaintiff alleges that MITs negligent response to defendant Charvak Prakash Karpe’s (“Karpe”) stalking of Julia contributed to Carpenter’s suicide. This matter is before us on plaintiffs motion to compel the production of documents generated during the course of Kathleen Wallace’s independent investigation into the circumstances surrounding Carpenter’s suicide. For reasons below, plaintiffs motion is ALLOWED.

BACKGROUND

Beginning in the fall of 2000, Karpe allegedly began stalking Julia. It is alleged that he would sleep overnight in the lounge outside her dorm room, kept her under constant surveillance, entered her room without permission, listened in on her private conversations, and stole data from her computer. In the spring of2001, Julia pursued charges against Karpe through the Judicial Committee (“JudComm”) of Random Hall, where she lived. Karpe admitted most of the charges against him, but the sanction ultimately applied allowed Karpe to remain in. Random Hall. After being notified of this decision, Julia engaged in suicidal behavior. Her friends became concerned and immediately took her to a friend’s house in Connecticut, where the friend’s mother, Dr. Lynn Josephson, MD (“Josephson”) listened to Julia’s story. Josephson became concerned for Julia’s safety and immediately sent an email to Dean Robert Randolph and then MIT President Charles Vest. She began this email with the statement, “please help me prevent another MIT student suicide,” and then spelled out in detail the critical nature of Julia’s situation. Following receipt of this email, Dean Randolph had a meeting with Julia and referred her to counseling in MIT’s medical department. Following Julia’s meeting with a counselor, Julia pursued an administrative review of JudComm’s decision. The administrative review committee, on April 25, 2001, decided to remove Karpe from Random Hall, but to allow him back in September, if he complied with certain other sanctions. On April 30, 2001, Julia was found dead in her dorm room. Her death was found to be suicide by cyanide ingestion.[3]
MIT received a great deal of negative and unwanted publicity surrounding Julia’s death — the twelfth suicide in eleven years.[4] Originally, MIT proposed conducting an internal investigation into Julia’s death that was to be headed by an MIT professor. Through a series of communications between the Carpenters and MIT, however, the Carpenters were able to convince MIT to appoint an independent investigator.[5] Ultimately, MIT appointed Dean Kathleen Wallace (“Wallace”) of Duke University to conduct an independent review of the events and circumstances leading up to Julia’s suicide. MIT issued two press releases on August 31 and September 12, 2001 announcing Wallace’s appointment and the commencement of her independent investigation.[6]
During the course of the investigation, Wallace spoke with both of Julia’s parents and their attorney to gather information relevant to her investigation into Julia’s suicide. Julia’s parents and their lawyer spoke freely with Wallace based upon Wallace and MITs representations that she was acting independent from MIT, and not as an agent of MIT, or client of MITs lawyers. Indeed, Timothy Carpenter, via affidavit attached as exhibit 16 to plaintiffs memorandum, has stated, “had I been informed that Ms. Wallace was: (a) acting as an agent of MIT or its lawyers in contemplation of this lawsuit; or (b) otherwise a client of MITs lawyers, I would never have met with her.” MIT and Wallace now seek to assert the attorney-client privilege over certain documents generated during the course of Wallace’s investigation, specifically Wallace’s draft reports and MITs suggested edits thereto.[7]

DISCUSSION

The attorney-client privilege protects from disclosure, at the option of the client, communications made in confidence to members of the bar, acting in their capacity as such, for the purpose of obtaining legal advice or representation. See In the Matter of a John Doe Grand Jury Investigation, 408 Mass 480, 481-83 (1990). The policy undergirding the attorney-client privilege is to “encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer’s being fully informed by the client.” Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Because the attorney-client privilege often deprives the court of relevant evidence, it is strictly construed, and *340 it is the client’s burden to establish its application to a particular communication. In re Reorganization of Electric Mutual Liability Insurance Co., Ltd.., 425 Mass. 419, 421 (1997).
MIT argues that the attorney-client privilege applies to certain communications between Wallace and MIT s counsel, Jeffrey Swope (“Swope”) because Wallace was acting as MITs agent, and because the communications were for the purpose of receiving legal counsel and advice. The court rejects both these contentions, as more fully set forth below.

1. Wallace was not an agent of MIT and was therefore not Swope's client

Massachusetts courts have recognized that “[t]he attorney-client privilege may extend to communications from the client’s agent or employee to the attorney.” Ellingsgard v. Silver, 352 Mass. 34, 40 (1967) citing Wigmore, Evidence (McNaughton rev.) §2318(1); McCormick on Evidence, §100. Contrary to MITs naked assertion, however, Wallace was not at any time, nor is she currently, MITs agent. “Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control. . .” Restatement (second) of Agency §1(1) (1958) (emphasis added). See also Kirkpatrick v. Boston Mutual, 393 Mass. 640, 645 (1985) (adopting the restatement definition of agency).
The critical element of control of the purported agent (Wallace) by the principal (MIT), however, is here clearly lacking. MIT has in fact conceded in their memorandum that they exercised no control whatsoever over Wallace’s investigation:
[Wallace] was granted complete freedom to decide how to conduct her investigation, including whom to interview and what documents to review. She also was given complete freedom to prepare her report in any manner and with any content that she chose. Most importantly, no one at MIT was in a position to influence any of the findings or recommendations that she might make. (Emphasis added.)
“The agency relation results if, but only if, there is an understanding between the parties... in which the fiduciary is subject to the directions of the one on whose account he acts ... It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries . . .” Restatement (Second) of Agency §1(1) comment b (emphasis added). By MITs own description of the relationship between them and Wallace, it is clear that Wallace was not subject to MITs directions, nor was she continually subjected to MITs will. She was, therefore, as a matter of law, not MITs agent. Accordingly, the attorney-client privilege between MIT and Swope did not extend to communications between Wallace and Swope, because Wallace was not MITs agent.[8]
MIT’s only remaining claim to an agency relationship with Wallace is the fact that the written retainer agreement between the parties states, “[flor the purposes of the federal Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. §1232g, you will conduct your review as an independent contractor acting as the agent of MIT.” (Emphasis added.) The court reads this statement according to its plain meaning— that Wallace would be considered an “agent” for the limited purpose of enabling her to receive protected information within the bounds of federal law. Nothing in the agreement between MIT and Wallace indicates that Wallace was to be considered an “agent” of MITs for any other purpose than this. The mere use of the word “agent” in the retainer agreement does conjure an agency relationship into being. “Agency is a legal concept which depends upon the existence of required factual elements . . . The relation which the law calls agency does not depend upon the intent of the parties to create it, nor their belief that they have done so.” Restatement (Second) of Agency §1(1) comment b. This court accordingly disregards the label MIT and Wallace might have given their relationship and instead looks to the actual nature of that relationship. As admitted by MIT, the nature of the relationship was one in which Wallace was given complete autonomy to conduct her investigation and prepare her report in the manner she saw fit, in exchange for MIT’s payment of an hourly rate. Wallace was thus, in fact, a non-agent independent contractor of MITs, and her communications to MIT’s counsel are therefore not protected by the attorney-client privilege.

2. Swope was not contacted by Wallace in his capacity as a lawyer, and the communications between Swope and Wallace were not for the purpose of rendering legal advice

Even assuming Wallace was MITs agent, the communications between Wallace and Swope do not fall under the protection of the attorney-client privilege. It is well established that the attorney-client privilege applies only (1) where legal advice is sought, (2) from a professional legal adviser acting in his capacity as such. See, e.g., United States v. Massachusetts Institute of Technology, 129 F.3d 681, 684 (1997) citing 8 J. Wigmore, Evidence §2292, at 554 (McNaughton rev. 1961).
Entry five of the privilege log relates to two documents: Wallace’s draft report with notations made by Swope and Dean Benedict (the “marked-up draft”), and a cover letter to the marked-up draft, explaining some of the suggested corrections. The cover letter begins, “[a]s promised, and with apologies again for the delay, here are Dean Benedict’s and my suggestions for your consideration of edits to your excellent report. We understand, of course, that the decisions about whether to adopt any particular suggestion is yours alone, and the suggestions are offered in that spirit.” The suggested corrections to the draft report, *341 and the cover letter’s explanation of those suggestions, amount to grammatical and stylistic edits. Nowhere is it indicated in either the cover letter or marked-up draft that the changes suggested were for legal reasons. Nowhere in the cover letter or marked-up draft report does it indicate that legal advice was being conveyed to Wallace. Indeed, we do not assume that MIT was attempting to exert any influence over what was publicly purported to be an independent investigation, so as to limit potential liability arising from Julia’s death.
Accordingly, because it appears to this court from our in camera review of document five, and from our inspection of the privilege log, that Wallace’s communications were not made to a lawyer acting in his capacity as such, and because Wallace was not seeking legal advice, the attorney-client privilege does not apply to the communications between Swope and Wallace concerning the draft report.
Furthermore, the purpose of the attorney-client privilege is to “encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer’s being fully informed by the client.” Upjohn Co., 449 U.S. at 389. Our in camera review, made in light of the independent nature of the report, leads us to conclude that the advice being rendered by Swope to Wallace was of a purely grammatical and stylistic nature — for purposes of increasing the readability and clarity of the report. Thus, because Swope was not rendering legal advice to Wallace, the policy underlying the privilege is not implicated by their communications.

3. For reasons of fairness, any attorney-client privilege asserted over Wallace’s draft reports has been waived

“The attorney-client privilege ‘was intended as a shield, not a sword.’ ” Sax v. Sax 136 F.R.D. 542, 543 (D.Mass. 1991) (quoting Pitney-Bowes, Inc. v. Mestre, 86 F.R.D. 444, 446 (S.D.Fla. 1980}). It is undisputed in the record that the Carpenters spoke with Wallace, revealing detailed and private aspects of their daughter’s life, only because Wallace’s investigation was purported to be wholly independent of MIT. Now, MIT, after having obtained detailed and private information about the life of Julia Carpenter that could be useful to their defense of Carpenter’s action, seeks to shield the initial conclusions drawn from that information. The attorney-client privilege was not designed for such stratagems, and this court will not sanction such abusive assertions of the privilege. Instead, we hold MIT to the original representation which was reasonably relied upon by the Carpenters — that Wallace was acting independent of MIT and not as MITs agent. The Carpenters, having reasonably relied upon this representation, are entitled to all draft reports generated by Wallace, and all comments made thereto by Swope and Dean Benedict.

ORDER

For the forgoing reasons, it is hereby ORDERED that plaintiff s motion to compel the production of all documents generated by Kathleen Wallace during her independent investigation into the death of Julia Miles Carpenter be ALLOWED. It is further ORDERED that the defendant MIT produce to plaintiffs counsel within 10 days from the date of this order documents numbered 1 through 16 on the privilege log appended as exhibit twenty to plaintiffs motion.

The court notes with great incredulity that at no time did any MIT administrator notify the Cambridge Police Department of the possible ongoing criminality of Karpe’s alleged conduct under G.L.c. 265, §43A (criminal harassment statute making Karpe’s alleged conduct punishable by up to two and a half years in a house of correction or by a fine of up to $1,000, or by both such fine and imprisonment). Nor did any MIT administrator inform Julia of her legal right to seek a restraining order from the Massachusetts Superior Court. The colleges and universities of this Commonwealth are not sovereign entities — our laws, and law enforcement agents, do not stop at their gates. Where criminal conduct has occurred on college property, as the allegations in this case make clear, college students should know that they have every right to seek their first course of redress from the municipal police and state courts. It is therefore this court’s sincere hope that colleges and universities will now make it their responsibility to inform and educate their students of their legal rights under the laws of the Commonwealth when they are being stalked, harassed, or threatened by fellow students.

See, e.g., Patrick Heafy, 11 Years, 11 Suicides, Boston Globe, Feb. 5, 2001, atAl Metro Region, attached to plaintiff s memorandum as exhibit 2.

This extensive series of conversations is outlined in detail at pages 6-7 of plaintiffs memorandum.

Both press releases stated, “Kathleen C. Wallace, associate dean for judicial affairs at Duke University, will conduct an independent review of MITs response to Julia Carpenter’s complaints against an MIT student who lived in her residence hall. . .”

MIThas generated a privilege log listing these documents, attached as exhibit 20 to plaintiffs memorandum. All of them concern communications between Wallace and Jeffrey Swope, MITs attorney, regarding the draft of Wallace’s investigative report into Julia’s death. The court has conducted an in camera review of what is listed as document five. Document five is actually two documents: the draft report itself with notations made by Swope and Dean Benedict, and a cover letter explaining this marked-up draft.

M1T misstates the law of EUingsgard when they write in their memorandum “[t] o the extent Dean Wallace was working for MIT as an independent contractor, the attorney-client relationship between Attorney Swope and MIT extended to her as well.” EUingsgard explicitly states that “[t]he attorney-client privilege may extend to communications from the client’s agent or employee to the attorney.” 352 Mass. 34, 40 (1967) (emphasis added). According to the Restatement, independent contractors are only agents when they meet the test for agency — that is, among other things, when they are *342 subject to the control of the principal. Restatement (second) of Agency §2. As discussed above, however, Wallace was not subject to MIT’s control, and was therefore not MITs agent. As an independent contractor who is not also an agent, Wallace’s communications to MITs counsel are not subject to the attorney-client privilege. MIT's emphasis on Wallace’s status as an independent contractor is therefore misplaced— the dispositive question is whether Wallace was an agent. MIT, by admitting that they relinquished all control over Wallace’s investigation, has conceded that Wallace was not their agent.