Concurring opinion filed by Circuit Judge PILLARD.
 

 KAVANAUGH, Circuit Judge:
 

 The pharmaceutical company Boehringer claimed attorney-client privilege over certain documents subpoenaed by the Federal Trade Commission. The attorney-client privilege applies to a communication between attorney and client if at least "one of the significant purposes" of the communication was to obtain or provide legal advice.
 
 In re Kellogg Brown & Root, Inc.
 
 ,
 
 756 F.3d 754
 
 , 758 (D.C. Cir. 2014). Under that standard, the attorney-client privilege applies to the documents at issue here. We affirm the judgment of the District Court.
 

 I
 

 A drug manufacturer that holds a patent has a market advantage. When a generic drug company challenges the validity of that patent, it threatens the patent holder's monopoly. Such a challenge can result in a settlement in which the patent holder pays the challenger to drop the challenge. That scenario is known as a "reverse payment" settlement-so labeled because the settlement requires the patent holder to "pay the alleged infringer, rather than the other way around."
 
 FTC v. Actavis, Inc.
 
 ,
 
 570 U.S. 136
 
 , 141,
 
 133 S.Ct. 2223
 
 ,
 
 186 L.Ed.2d 343
 
 (2013).
 

 In
 
 Actavis
 
 , the Supreme Court analyzed the legality of reverse payments. If the payments are made simply to avoid litigation costs, they may be lawful. But if "the basic reason is a desire to maintain and to share patent-generated monopoly profits," then "the antitrust laws are likely to forbid the arrangement."
 

 Id.
 

 at 158
 
 ,
 
 133 S.Ct. 2223
 
 .
 

 In 2008, a patent negotiation occurred between Boehringer (the name brand with the patent) and Barr (the generic seeking to challenge the patent). Ultimately, the parties reached a reverse payment settlement.
 

 The Federal Trade Commission pays close attention to reverse payment settlements to ensure that they do not run afoul of antitrust law. In 2009, the Commission began investigating the Boehringer-Barr settlement. During the investigation, the Commission subpoenaed documents from Boehringer. Boehringer claimed that the subpoenaed documents were created by Boehringer employees for Boehringer's general counsel, Marla Persky, at her request. The documents allowed Persky to analyze and navigate the treacherous antitrust issues surrounding reverse payment settlements. Other documents reflected communications between Persky and Boehringer executives regarding the possible settlement. Boehringer asserted attorney-client privilege over the documents.
 

 The burden is on the proponent of the privilege to demonstrate that it applies.
 
 See
 

 United States v. Legal Services for New York City
 
 ,
 
 249 F.3d 1077
 
 , 1081 (D.C. Cir. 2001). In a thorough and careful opinion, the District Court agreed with Boehringer that the documents at issue here are covered by the attorney-client privilege. To the extent the Commission challenges the legal test employed by the District Court, our review is de novo. To the extent the Commission challenges the facts found by the District Court, our review is for clear error.
 

 II
 

 As relevant here, the attorney-client privilege applies to a confidential communication between attorney and client if the communication was made for the purpose of obtaining or providing legal advice.
 
 See
 

 Upjohn Co. v. United States
 
 ,
 
 449 U.S. 383
 
 ,
 
 101 S.Ct. 677
 
 ,
 
 66 L.Ed.2d 584
 
 (1981) ;
 
 In re Kellogg Brown & Root, Inc.
 
 ,
 
 756 F.3d 754
 
 , 757 (D.C. Cir. 2014). The privilege covers both (i) those communications in which an attorney gives legal advice; and (ii) those communications in which the client informs the attorney of facts that the attorney needs to understand the problem and provide legal advice.
 

 In the corporate context, the attorney-client privilege applies to communications between corporate employees and a corporation's counsel made for the purpose of obtaining or providing legal advice. The privilege applies regardless of whether the attorney is in-house counsel or outside counsel.
 

 The application of the attorney-client privilege can become more complicated when a communication has multiple purposes-in particular, a legal purpose and a business purpose. In this case, for example, the communications had a legal purpose: to help the company ensure compliance with the antitrust laws and negotiate a lawful settlement. But the communications also had a business purpose: to help the company negotiate a settlement on favorable financial terms.
 

 In a situation like this where a communication has multiple purposes, courts apply the "primary purpose" test to determine whether the communication is privileged.
 
 See
 

 Kellogg
 
 ,
 
 756 F.3d at 759
 
 . In
 
 Kellogg
 
 , this Court recently explained that courts applying the primary purpose test should not try "to find
 
 the
 
 one primary purpose" of a communication. Attempting to do so "can be an inherently impossible task" when the communications have "overlapping purposes (one legal and one business, for example)."
 

 Id.
 

 "It is often not useful or even feasible to try to determine whether the purpose was A or B when the purpose was A and B."
 

 Id.
 

 Rather, courts applying the primary purpose test should determine "whether obtaining or providing legal advice was
 
 one of
 
 the significant purposes of the attorney-client communication."
 

 Id.
 

 at 760
 
 (emphasis added);
 
 see
 
 1 Restatement (Third) of the Law Governing Lawyers § 72, Reporter's Note, at 554 (2000).
 

 Our approach to this issue, as we explained in
 
 Kellogg
 
 , helps to reduce uncertainty regarding the attorney-client privilege. Reducing uncertainty is important in the privilege context because, as the Supreme Court has stated, an "uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."
 
 Upjohn
 
 ,
 
 449 U.S. at 393
 
 ,
 
 101 S.Ct. 677
 
 .
 

 In this case, the question therefore is whether obtaining or providing legal advice was one of the significant purposes of the communications at issue. The answer is yes.
 

 The relevant communications consist primarily of the transmission of factual information from Boehringer's employees to the general counsel, at the general counsel's request, for the purpose of assisting the general counsel in formulating her legal advice regarding a possible settlement. Other communications were between the general counsel and the corporation's executives regarding the settlement. All of those communications are protected by the attorney-client privilege because one of the significant purposes of the communications was "obtaining or providing legal advice"-namely, settlement and antitrust advice.
 
 Kellogg
 
 ,
 
 756 F.3d at 758
 
 .
 

 To be sure, the communications at issue here also served a business purpose. The decision whether and at what price to settle ultimately was a business decision as well as a legal decision for Boehringer. But as we stated in
 
 Kellogg
 
 , what matters is whether obtaining or providing legal advice was one of the significant purposes of the attorney-client communications. Here, as the District Court correctly concluded, one of the significant purposes of these communications was to obtain or provide legal advice. It follows that Boehringer's general counsel was acting as an attorney and that the communications are privileged.
 

 In so ruling, we emphasize that the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."
 
 Upjohn
 
 ,
 
 449 U.S. at 395
 
 ,
 
 101 S.Ct. 677
 
 . In this case, therefore, the attorney-client privilege did not and does not prevent the FTC's discovery of the underlying facts and data possessed by Boehringer and its employees. Nor did it prevent the FTC's discovery of pre-existing business documents. But the attorney-client privilege does protect the
 
 communication
 
 of facts by corporate employees to the general counsel when, as here, the communications were for the purpose of obtaining or providing legal advice. As the
 
 Upjohn
 
 Court noted, discovery "was hardly intended to enable a learned profession to perform its functions ... on wits borrowed from the adversary."
 

 Id.
 

 at 396
 
 ,
 
 101 S.Ct. 677
 
 (quoting
 
 Hickman v. Taylor
 
 ,
 
 329 U.S. 495
 
 , 516,
 
 67 S.Ct. 385
 
 ,
 
 91 L.Ed. 451
 
 (1947) ).
 
 [1]
 

 * * *
 

 In its landmark decision in
 
 Upjohn Co. v. United States
 
 ,
 
 449 U.S. 383
 
 ,
 
 101 S.Ct. 677
 
 ,
 
 66 L.Ed.2d 584
 
 (1981), the Supreme Court explained the importance of the attorney-client privilege in the business context: The "vast and complicated array of regulatory legislation" requires corporations to "constantly go to lawyers to find out how to obey the law ... particularly since compliance with the law in this area is hardly an instinctive matter."
 

 Id.
 

 at 392
 
 ,
 
 101 S.Ct. 677
 
 . So it was in this case. We affirm the judgment of the District Court.
 

 So ordered.
 

 For a few documents sought by the FTC, Boehringer asserted only the work product privilege and not the attorney-client privilege. This Court's prior decision in this case analyzed the work product issue.
 
 FTC v. Boehringer Ingelheim Pharmaceuticals, Inc.
 
 ,
 
 778 F.3d 142
 
 (D.C. Cir. 2015). On remand, the District Court applied that decision. In a cross-appeal in this case, Boehringer challenges the District Court's decision on the work product privilege. But Boehringer forthrightly recognizes that this panel is bound by the prior panel's decision. Boehringer's real beef is with the prior decision. We find no reversible error in the District Court's application of our prior decision.