(Slip Opinion)

# Assertion of Executive Privilege Over Deliberative Materials Regarding Inclusion of Citizenship Question on 2020 Census Questionnaire

The President may assert executive privilege over "priority documents" relating to the Secretary of Commerce's decision to include a citizenship question on the 2020 decennial census questionnaire that the House Committee on Oversight and Reform has demanded as responsive to its subpoenas. The "priority documents" all involve predecisional deliberative material, attorney-client communications, or attorney work product.

The President may make a protective assertion of executive privilege over the remaining subpoenaed documents to give time for the Departments of Commerce and Justice to determine whether any remaining documents may be subject to privilege.

June 11, 2019

THE PRESIDENT
  THE WHITE HOUSE

Dear Mr. President,

The Secretary of Commerce and I are requesting that you assert executive privilege with respect to documents responsive to a subpoena served on the Department of Justice and a subpoena served on the Department of Commerce by the Committee on Oversight and Reform of the United States House of Representatives ("Committee") on April 2, 2019. The subpoenas relate to the Committee's investigation into the Secretary's decision to include a citizenship question on the 2020 decennial census questionnaire. The Committee has scheduled a meeting for June 12, 2019, to vote on a resolution holding the Secretary and me in contempt of Congress for failing to comply with the subpoenas. This letter formally requests you assert executive privilege and explains the legal basis for such an assertion.[1]

## I.

On December 12, 2017, the General Counsel of the Justice Management Division sent a letter to the U.S. Census Bureau requesting the

---

[1] The Secretary of Commerce has made a parallel request. *See* Letter for the President from Wilbur Ross, Secretary, Department of Commerce (June 11, 2019).

reinstatement of a question regarding citizenship on the 2020 decennial census questionnaire. The letter stated that citizenship data is critical to the Department of Justice's enforcement of the Voting Rights Act and its protections against racial discrimination in voting. The Department explained that, to enforce the Act's requirements, it needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected, and that the census is the most appropriate vehicle for collecting that data. Approximately three months later, on March 26, 2018, the Secretary announced that he was reinstating a citizenship question on the census in response to the Department's request.

On January 8, 2019, the Committee sent a letter to the Secretary requesting an extremely broad set of documents regarding the Secretary's decision to include the citizenship question on the census questionnaire. On February 12, 2019, the Committee sent a letter to the Acting Attorney General requesting similar documents regarding the Department of Justice's role in that decision. The Departments promptly began producing thousands of responsive documents to the Committee on a rolling basis, and made multiple witnesses available for interviews.

Despite these efforts, the Committee issued separate subpoenas to the Secretary and me on April 2, 2019, seeking many of the documents requested in the Committee's January 8 and February 12 letters. The subpoena issued to the Secretary requested eleven specific documents, including e-mails between the Secretary and his close advisers, as well as e-mails and documents produced by or sent to an attorney in the Department of Commerce's Office of General Counsel. The subpoena also requested all communications from January 20, 2017 through December 12, 2017 among Department of Commerce officials or between such officials and outside entities concerning the citizenship question. The subpoena issued to me requested a memorandum and note to the Acting Assistant Attorney General for the Department of Justice's Civil Rights Division from the same Department of Commerce attorney regarding the citizenship question. The subpoena also requested all documents and communications from January 20, 2017 through December 12, 2017 within the Department of Justice and with outside entities regarding the Department of Justice's request to include the citizenship question.

The Department of Justice and the Department of Commerce have made substantial efforts to accommodate the Committee's oversight interests concerning the citizenship question. To date, the Department of Commerce has produced almost 14,000 pages of responsive documents. The Secretary testified before the Committee for nearly seven hours, and the Department of Commerce also agreed to make available for voluntary transcribed interviews its General Counsel, a senior adviser to the Secretary, and a former senior counsel to the General Counsel. The Department of Justice, meanwhile, has made eight document submissions to the Committee between February and May of 2019 that total more than 17,000 pages. In addition, the Principal Deputy Assistant Attorney General for the Civil Rights Division voluntarily appeared for a transcribed interview, as did a Counselor to the Attorney General.

While the Department of Justice and the Department of Commerce have produced an extensive amount of material, both Departments have withheld from production a limited number of documents that are covered by components of executive privilege, including the deliberative process, attorney-client, and attorney work product components. A federal court has held that many of these same documents are privileged from disclosure in ongoing litigation over the inclusion of the citizenship question on the census. *See New York v. U.S. Dep't of Commerce*, 345 F. Supp. 3d 444, 451 n.7 (S.D.N.Y. 2018) (noting denials of motions to compel on, *inter alia*, "deliberative-process-privilege grounds" and "attorney-client-privilege grounds"). Despite the Executive Branch's good-faith efforts at accommodating the Committee's information needs, on June 3, 2019, the Committee sent separate letters to the Secretary and me stating that it would schedule a vote to hold each of us in contempt of Congress as a result of our purported failures to comply with the April 2 subpoenas. Although the Committee demanded an immediate production of all subpoenaed documents in unredacted form, it stated that it would consider postponing the contempt vote if the Secretary and I produced certain documents of priority to the Committee. Those documents include (i) the eleven documents specified in the Committee's subpoena to the Secretary; and (ii) the memorandum and note to the Acting Assistant Attorney General for the Civil Rights Division from the Department of Commerce attorney, as well as all drafts of the Department of Justice's December 2017 letter to the U.S. Census Bureau requesting the inclusion of a citi-

zenship question. The Committee's contempt vote is currently scheduled for June 12, 2019.[2]

## II.

In my view, production of the priority documents identified in the Committee's June 3 letters—all of which involve predecisional deliberative material, attorney-client communications, or attorney work product—would have a significant chilling effect on future deliberations among senior executive branch officials, and would compromise the confidentiality on which the Executive Branch's attorney-client relationships depend. These confidentiality concerns are heightened at this time because, as noted above, a federal court has held that a number of these documents are protected by privilege in ongoing litigation. Accordingly, the Secretary and I respectfully request that you assert executive privilege over the specific documents identified in the Committee's June 3 letters. We also request that you make a protective assertion of executive privilege with respect to the remainder of the subpoenaed documents in order to give the Departments of Commerce and Justice time to determine whether a conclusive assertion of executive privilege would be necessary with respect to any of the remaining documents.

## A.

The priority documents requested in the Committee's June 3 letters fit squarely within the scope of executive privilege. Executive privilege flows from the authorities vested in the President by Article II of the Constitution and "has been asserted by numerous Presidents from the earliest days of our Nation." *Congressional Requests for Confidential*

___

[2] The Committee has also indicated that it scheduled the contempt vote based on my instruction to a Department of Justice official not to appear for a deposition without the assistance of agency counsel. As the Department has explained, the Committee may not constitutionally prohibit agency counsel from accompanying agency employees called to testify about matters that potentially involve information protected by executive privilege. *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __ (May 23, 2019). Therefore, the congressional subpoena purporting to require the Department official to appear without agency counsel was legally invalid, and my instruction to the Department official was lawful and necessary to prevent such a constitutional violation.

*Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989) ("*Requests for Confidential Information*"). It is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974).

One category of documents protected by executive privilege is "Executive Branch deliberative communications." *Assertion of Executive Privilege Over Communications Regarding EPA's Ozone Air Quality Standards and California's Greenhouse Gas Waiver Request*, 32 Op. O.L.C. 1, 2 (2008) ("*EPA Assertion*") (Mukasey, Att'y Gen.).[3] The Supreme Court has recognized "the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties," concluding that "the importance of this confidentiality is too plain to require further discussion." *Nixon*, 418 U.S. at 705. "Threat of compelled disclosure of confidential Executive Branch deliberative material can discourage robust and candid deliberations, for '[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.'" *Assertion of Executive Privilege Over Documents Generated in Response to Congressional Investigation into Operation Fast and Furious*, 36 Op. O.L.C. __, at *3–4 (June 19, 2012) ("*Fast and Furious Assertion*") (Holder, Att'y Gen.) (quoting *Nixon*, 418 U.S. at 705). It is for this reason that Presidents have repeatedly asserted executive privilege to protect confidential deliberative materials of senior executive branch officials from disclosure to Congress.[4]

---

[3] *See also Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 2 (2007) ("*U.S. Attorneys Assertion*") (Clement, Act'g Att'y Gen.); *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 1–2 (1999) ("*Clemency Assertion*") (Reno, Att'y Gen.); *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) (Reno, Att'y Gen.).

[4] *See, e.g.*, *Fast and Furious Assertion*, 36 Op. O.L.C. at *2–5; *EPA Assertion*, 32 Op. O.L.C. at 2–3; *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 8–11 (2008); *Assertion of Executive Privilege with Respect to Prosecutorial Documents*, 25 Op. O.L.C. 1, 1–2 (2001); *Clemency Assertion*, 23 Op. O.L.C. at 1–4; *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 29–31 (1981) (Smith, Att'y Gen.).

The priority documents requested in the Committee's June 3 letters—the eleven documents identified in the subpoena to the Secretary, the memorandum and note concerning the citizenship question drafted by a Department of Commerce attorney, and drafts of the Department of Justice's 2017 letter requesting the inclusion of the citizenship question—are deliberative communications protected by executive privilege. Each of these documents or communications was generated in the course of the deliberative process concerning either the Secretary's decision to reinstate a citizenship question or the Department of Justice's decision to request that such a question be reinstated, and reflect the internal advice, opinions, or recommendations of senior executive branch officials. All of the Commerce documents predate the Secretary's March 2018 decision to reinstate a citizenship question, and all of the Justice documents predate its 2017 letter requesting the inclusion of the question. To protect the integrity of executive branch decision-making, department heads and their advisers must be able to engage in full and candid discussions about the advantages and disadvantages of significant and sensitive decisions, such as the Secretary's decision to include the citizenship question on the census questionnaire. Indeed, a federal court has already held that some of these priority documents, such as certain of the drafts of the 2017 letter requesting the inclusion of the citizenship question, are protected by the deliberative process privilege for substantially similar reasons. *See* Memorandum Opinion and Order at 5, *New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (S.D.N.Y. Oct. 5, 2018) (Dkt. No. 369).

Executive privilege also protects attorney-client communications and attorney work product. *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996) (Reno, Att'y Gen.). In the common law, the attorney-client privilege "is the oldest of the privileges for confidential communications." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* As for attorney work product, in the ordinary case, "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). Were attorney work product "open to opposing counsel on mere demand, . . . [i]nefficiency, unfairness and

sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial . . . , [a]nd the interests of the clients and the cause of justice would be poorly served." *Id.* at 511. These considerations apply with even greater force where senior executive branch officials are the clients. These officials must be able to have free and frank consultations with their attorneys about the scope of their legal authorities and responsibilities, without fear that these discussions, or attorney work product generated in preparation for potential litigation, will be publicized.

Some of the priority documents requested by the Committee are covered by the attorney-client-communications or attorney-work-product components of executive privilege. Specifically, the memorandum and note drafted by an attorney in the Department of Commerce's Office of General Counsel contain legal analysis, recommendations, and advice concerning the reinstatement of a citizenship question. Versions of this memorandum were transmitted to the Secretary as well as to the Acting Assistant Attorney General for the Department of Justice's Civil Rights Division, and in both instances offered advice to a client regarding the legal authority and pertinent case law for various potential courses of action and the strengths and weaknesses of these alternatives. Moreover, the attorney was asked to prepare the memorandum precisely because the Departments expected that litigation would follow a decision to include the citizenship question. If the attorney-work-product doctrine is to have any force, then an executive branch agency may not be required to disclose attorney work product developed in preparation for potential litigation while that very litigation is ongoing. For these reasons, the memorandum drafted by the Department of Commerce attorney, and the note ancillary to it, fit comfortably within the attorney-client-communications and attorney-work-product components of executive privilege. This conclusion, too, is consistent with a federal court's holding that the memorandum is protected by the common-law attorney-client privilege. *See* Order, *New York*, No. 18-CV-2921 (Sept. 30, 2018) (Dkt. No. 361).

Accordingly, I conclude that the subpoenaed materials identified as priority documents in the Committee's June 3, 2019 letters clearly fall within the scope of executive privilege.

**B.**

I next explain the need for you to make a protective assertion of executive privilege with respect to the remainder of the documents requested in the Committee's April 2 subpoenas to the Secretary and me. In cases "where a committee has declined to grant sufficient time to conduct a full review, the President may make a protective assertion of privilege to protect the interests of the Executive Branch pending a final determination about whether to assert privilege." Letter for the President from William P. Barr, Attorney General at 1–2 (May 8, 2019); *Protective Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 1 (1996) ("*Protective Assertion of Executive Privilege*") (Reno, Att'y Gen.). The remainder of the requested documents—identified in item 2 of the schedule for each of the subpoenas—include all documents and communications between Department of Commerce and Department of Justice officials within and outside of the Executive Branch through most of 2017 regarding the decision to include a citizenship question on the census questionnaire. That extremely broad request sweeps in many tens of thousands of pages of information, much of which has already been produced to the Committee, but much of which the Departments of Justice and Commerce are still continuing to process. These materials, which may include documents withheld on privilege grounds during ongoing litigation, undoubtedly have the potential to include additional deliberative, attorney-client, or attorney-work-product documents protected by executive privilege.

Consistent with paragraph 5 of President Reagan's 1982 memorandum about assertions of executive privilege, the Department of Justice has requested that the Chairman of the Committee hold the subpoenas in abeyance and delay any vote recommending that the House of Representatives approve contempt resolutions for failing to comply with the subpoenas, pending a final presidential decision on whether to invoke executive privilege as to the remainder of the documents. *See* Memorandum for the Heads of Executive Departments and Agencies, *Re: Procedures Governing Responses to Congressional Requests for Information* at 2 (Nov. 4, 1982). The Chairman, however, has not agreed to adjourn the markup session scheduled for 10:00 a.m. on June 12 on a resolution recommending findings of contempt. In these circumstances, where a department lacks sufficient time to review the requested documents, you

may properly assert executive privilege with respect to the entirety of the remaining materials that the Committee has demanded, pending a final decision on the matter. You would be making only a preliminary, protective assertion of executive privilege designed to ensure your ability to make a final assertion, if necessary, over some or all of the remaining materials. *See Protective Assertion of Executive Privilege*, 20 Op. O.L.C. at 1. I conclude that such a preliminary, protective assertion is legally permissible.

## III.

A congressional committee "may overcome an assertion of executive privilege only if it establishes that the subpoenaed documents are '*demonstrably critical* to the responsible fulfillment of the Committee's functions.'" *Assertion of Executive Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 32 Op. O.L.C. 7, 11 (2008) (emphasis added) (quoting *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc)).[5] "Those functions must be in furtherance of Congress's legitimate legislative responsibilities," *id.*, because "[c]ongressional oversight of Executive Branch actions is justifiable only as a means of facilitating the legislative task of enacting, amending, or repealing laws," *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 29–31 (1981) ("*1981 Assertion*") (Smith, Att'y Gen.); *see McGrain v. Daugherty*, 273 U.S. 135, 176 (1927) (congressional oversight power may be used only to "obtain information in aid of the legislative function"). The Committee has not satisfied that high standard here.

The Committee has asserted that it needs the subpoenaed documents because it is investigating "the actual reasons behind the Trump Administration's decision to add a citizenship question to the 2020 Census." Letter for Wilbur L. Ross, Jr., Secretary, Department of Commerce, from Elijah E. Cummings, Chairman, Committee on Oversight and Reform, U.S. House of Representatives at 2–3 (June 3, 2019) ("Cummings Letter

---

[5] *See also, e.g.*, *U.S. Attorneys Assertion*, 31 Op. O.L.C. at 2; *Clemency Assertion*, 23 Op. O.L.C. at 2; *Nixon*, 418 U.S. at 707 ("[I]t is necessary to resolve those competing interests in a manner that preserves the essential functions of each branch.").

to Ross"); *see* Letter for William P. Barr, Attorney General, from Elijah E. Cummings, Chairman, Committee on Oversight and Reform, U.S. House of Representatives at 2–3 (June 3, 2019) ("Cummings Letter to Barr") (similar). According to the Committee, the Secretary "began a secret campaign to add the citizenship question just days after assuming [his] post and several months before any request from the Department of Justice." Cummings Letter to Ross at 2; *see also* Cummings Letter to Barr at 2 (similar). The Committee believes that "the real reason the Trump Administration sought to add the citizenship question was not to help enforce the Voting Rights Act at all, but rather to gerrymander congressional districts in overtly racist, partisan, and unconstitutional ways." Cummings Letter to Ross at 2; *see also* Cummings Letter to Barr at 2 (similar). The Committee has stated that its investigation "may lead to legislation" concerning the processes and notification requirements for adding questions to the census. Cummings Letter to Ross at 6; *see also* Cummings Letter to Barr at 6 (similar).

The Constitution authorizes Congress to enact laws governing the census. *See* U.S. Const. art. I, § 2. Thus, I recognize that the Committee has legitimate oversight interests in this area generally. It is not sufficient, however, that the subpoenaed documents may, at some level, relate to a legitimate oversight interest. To overcome an assertion of executive privilege, a congressional committee must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Senate Select Comm.*, 498 F.2d at 733. "While fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Id.* at 732; *see also Requests for Confidential Information*, 13 Op. O.L.C. at 159 ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").

The Committee has yet to identify any specific legislative need for the subpoenaed documents, much less a "demonstrably critical" one. *Senate Select Comm.*, 498 F.2d at 731. It is difficult to conceive how the Secretary's deliberative e-mails regarding the inclusion of the citizenship question, or an attorney's legal analysis and assessment regarding that

inclusion, are necessary predicates to Congress's enactment of legislation regarding the census. Rather, the Committee appears to believe it may investigate any and all processes of decision-making in the Executive Branch regarding the census, regardless of whether that investigation has any bona fide relationship to possible legislation, and regardless of whether that investigation intrudes on executive branch prerogatives.

Thus, what the Committee appears to seek is a "precise reconstruction of past events," not because there are "specific legislative decisions that cannot responsibly be made without" it, but simply for the sake of the information itself. *Id.* at 732–33. That purpose does not clear the high bar required to overcome an assertion of executive privilege. The "informing function" that Congress possesses under Article I "is that of informing itself about subjects susceptible to legislation, not that of informing the public." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 531 (9th Cir. 1983) (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 132–33 (1979)); *see also Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 4 (2007) ("Broad, generalized assertions that the requested materials are of public import are simply insufficient under the 'demonstrably critical' standard."). The Committee has not identified any "specific legislative decisions that cannot responsibly be made without access" to the privileged materials. *Senate Select Comm.*, 498 F.2d at 733.

The Departments of Justice and Commerce, moreover, have already made extensive efforts to accommodate the Committee's requests. As discussed above, each Department has produced tens of thousands of pages of responsive documents and has made senior officials available for hearings and transcribed interviews—and that process remains ongoing. Except where the Committee unconstitutionally demanded that executive branch officials appear without agency counsel, the Executive Branch has made every official requested by the Committee in this investigation available to testify, declining to answer only those questions that implicated a protected privilege. *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __ (May 23, 2019). In my view, through these efforts, the two Departments have been fulfilling in good faith their constitutional "obligation . . . to make a principled effort to acknowledge, and if possible to meet, the [Committee's] legitimate needs." *1981 Assertion*, 5 Op. O.L.C. at 31.

Accordingly, when I balance the Committee's attenuated legislative interest in the subpoenaed documents against the Executive Branch's strong interest in protecting the confidentiality of its internal deliberations and the integrity of attorney-client communications and attorney work product, I conclude that the Committee has not established that the subpoenaed documents are "demonstrably critical to the responsible fulfillment" of the Committee's legitimate legislative functions. *Senate Select Comm.*, 498 F.2d at 731.

## IV.

For the reasons set forth above, I have concluded that you may properly assert executive privilege over the priority subpoenaed documents identified in the Committee's June 3, 2019 letters, and may properly make a protective assertion of executive privilege with respect to the remainder of the subpoenaed documents to give the Departments of Commerce and Justice time to determine whether any remaining documents may be subject to privilege. I respectfully request that you do so.

WILLIAM P. BARR
*Attorney General*