# Supreme Court of Texas

No. 21-0534

The University of Texas System,

*Petitioner*,

v.

The Franklin Center for Government and Public Integrity
and Jon Cassidy,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued January 11, 2023**

JUSTICE LEHRMANN delivered the opinion of the Court, in which Chief Justice Hecht, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

JUSTICE DEVINE filed a dissenting opinion, in which Justice Boyd joined.

Justice Blacklock did not participate in the decision.

The overarching issue in this case is whether documents underlying an external investigation into allegations of undue influence in a public university's admissions process are protected by the

attorney–client privilege and are thus exempt from disclosure under the Texas Public Information Act. We hold that (1) the investigator acted as a "lawyer's representative" in conducting the investigation; (2) the disputed documents fall within the attorney–client privilege, as they were made between privileged persons and were for the purpose of facilitating the rendition of legal services to the university; (3) the university did not waive the privilege by disclosing some of the disputed documents to the investigator; and (4) to the extent the investigator's final report directly quoted from or otherwise disclosed "any significant part" of the disputed documents, publication of the report waived the university's attorney–client privilege as to those specific documents. Because the court of appeals held that all the underlying documents must be disclosed, we reverse its judgment and remand to the trial court for further proceedings.

## I. Background

The facts of this case are largely undisputed. In 2013, a member of The University of Texas System Board of Regents and members of the media raised questions about the possibility of undue influence in the admissions process at UT Austin. The System's then-Chancellor, Francisco Cigarroa, directed the System's General Counsel, Daniel Sharphorn, to conduct an internal investigation to determine whether the allegations had merit. After interviewing admissions officials and reviewing admissions data, Sharphorn concluded that there was no evidence of improper influence.

Shortly after the System released Sharphorn's report to the public, a former admissions official reported to Sharphorn, as well as to

2

Chancellor Cigarroa and the Executive Vice Chancellor for Academic Affairs, that UT Austin's President occasionally exerted pressure on the admissions office to admit applicants with lesser qualifications in response to external influences. At Chancellor Cigarroa's direction, Sharphorn hired Kroll Associates, an independent firm, "to more thoroughly and comprehensively review the admissions process, investigate allegations of external pressures on the admissions process, and determine whether any factors other than individual merit . . . influence decisions to admit or deny applicants to UT Austin."

During its investigation, which focused on undergraduate, law school, and business school admissions, Kroll obtained thousands of documents from UT Austin—including approximately 9,500 emails—and conducted interviews with relevant individuals. In 2015, Kroll completed its investigation and presented a 101-page final report to Sharphorn and then-Chancellor William H. McRaven.

The Kroll Report, which contains findings, recommendations, and suggestions for future best practices, was published on UT Austin's website. In summary, the Kroll Report discusses several incidents of attempted external influence on admissions but concludes that UT Austin "appears to have violated no law, rule, or policy (with the possible exception of the prohibition against legacy admissions)." Kroll also found "no evidence that the Dean [of the Law School] or others at the Law School acted improperly or in any way compromised the integrity of the admissions process." As to the McCombs School of Business, its Dean told Kroll that "attempts to influence the process externally do occur" but officials had "never felt pressured by external forces." And as

3

to university admissions generally, Kroll concluded that UT Austin's use of "holds" resulted in a "relatively small" number of "arguably less-qualified applicants who benefitted from the process."

Unsatisfied with the Kroll Report, Franklin Center for Government and Public Integrity reporter Jon Cassidy sought complete access to the documents underlying the report to determine whether Kroll omitted any significant information from it. Cassidy submitted a Texas Public Information Act request to the System for "[a]ll emails, interview transcripts and other documents provided to or obtained by Kroll investigators as part of their audit of admissions at UT Austin." The System resisted disclosure and sought an Attorney General decision on the withheld documents, *see* TEX. GOV'T CODE § 552.301(a), asserting that they are excepted from disclosure under the Act. Along with its request, the System submitted a representative sample of the information at issue. *See id.* § 552.301(e)(1)(D) (allowing submission of a representative sample if a voluminous amount of information is requested). In a letter opinion, the Attorney General concluded that many, but not all, of the requested documents are excepted from disclosure. Relevant here, the Attorney General agreed with the System's position that it may withhold some of the requested information on the ground that it is protected by the attorney–client privilege.

The System sued the Office of the Attorney General to challenge the portions of the ruling that ordered disclosure. The Franklin Center and Cassidy (collectively, Franklin) intervened, seeking a declaration that all requested documents are public information and a writ of

4

mandamus compelling the System to disclose the unredacted documents. While the litigation was pending, the System created a privilege log identifying and describing the information it had provided to the Attorney General as part of its representative sample. Although Franklin originally sought all documents obtained and created by Kroll (totaling 625,000 pages), Franklin ultimately narrowed the scope of its request to only the 744 documents contained in the privilege log, which included:

(1) Internal emails exchanged between UT System and UT Austin lawyers and clients, discussing or transmitting legal advice, that were shared with Kroll during the investigation;[1]

(2) Interview questions and notes created by Kroll during Kroll's interviews of UT System and UT Austin employees and officials;[2] and

(3) Draft redlined communications from General Counsel Sharphorn to interviewees that were shared with Kroll.[3]

The parties filed cross-motions for summary judgment. The System argued that all the documents are protected by the attorney–client privilege and that the privilege was not waived because Kroll acted as a "lawyer's representative." Franklin, however, asserted that the System waived the privilege by releasing the Kroll Report and, in

---

[1] The privilege log describes each of these emails, labeled UTS-00001 to UTS-00146, as a confidential communication made for the purpose of giving or receiving legal advice.

[2] The documents in the second category, comprising the vast majority of the requested documents, are labeled UTS-00147 to UTS-00722 and UTS-00727 to UTS-00734.

[3] The last category consists of the documents labeled UTS-00723 through UTS-00726.

5

any event, Kroll was not acting as a "lawyer's representative." After reviewing the disputed documents *in camera*, the trial court determined that they are privileged and granted the System's motion for summary judgment.

The court of appeals reversed and rendered judgment requiring disclosure of all the privilege-log documents, holding that Kroll was not a lawyer's representative. 664 S.W.3d 371, 383–84 (Tex. App.—Austin 2020). In so holding, the court of appeals concluded that the Kroll Report did not contain legal advice, Kroll did not provide legal services to the System, and Kroll's investigation was not performed to advise the System of facts that would expose it to legal liability. *Id.* at 381–82. We granted the System's petition for review.

## II. Discussion

The Texas Public Information Act "guarantees access to public information, subject to certain exceptions." *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P.*, 343 S.W.3d 112, 114 (Tex. 2011). Upon receiving a request for public information, a governmental body must promptly produce the information for inspection, duplication, or both, TEX. GOV'T CODE § 552.221, unless an exception applies. *See In re City of Georgetown*, 53 S.W.3d 328, 331 (Tex. 2001). The Act is to be liberally construed in favor of granting requests for information. TEX. GOV'T CODE § 552.001(b). Whether information qualifies as "public information" under the Act and whether an exception applies are questions of law. *See A & T Consultants, Inc. v. Sharp*, 904 S.W.2d 668, 674 (Tex. 1995).

6

Relevant to the circumstances here, the Act provides that a completed investigation made by or for a governmental body—like the Kroll investigation—is public information and not excepted from disclosure unless it is expressly made confidential under "other law." TEX. GOV'T CODE § 552.022(a)(1). The Texas Rules of Evidence are "other law" for purposes of Section 552.022. *See City of Georgetown*, 53 S.W.3d at 329. The System contends that the requested documents are exempt from disclosure under the "made confidential by other law" exception because they fall within the attorney–client privilege, which is contained in the rules of evidence.

## A. General Parameters of Privilege

The attorney–client privilege exists to facilitate free and open communication between attorneys and their clients. *See Paxton v. City of Dallas*, 509 S.W.3d 247, 259–60 (Tex. 2017). The privilege "applies with special force" in the governmental context because "public officials are duty-bound to understand and respect constitutional, judicial and statutory limitations on their authority; thus, their access to candid legal advice directly and significantly serves the public interest." *Id.* at 260.[4]

In Texas, the attorney–client privilege is governed by Texas Rule of Evidence 503. Under this rule, a "client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential

---

[4] Franklin asks the Court to reconsider whether the privilege should apply with special force in the governmental context. We decline this invitation.

7

communications made for the purpose of facilitating the rendition of professional legal services to the client." TEX. R. EVID. 503(b)(1). The privilege protects such communications that are between and among the lawyer, the client, and their respective representatives.[5] *See id.*; *In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 49–50 (Tex. 2012). A communication is "confidential" if it is not intended to be disclosed to third persons other than (1) those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or (2) those reasonably necessary for the transmission of the communication. TEX. R. EVID. 503(a). The presence of third persons

---

[5] The privilege provides:

(1) **General Rule.** A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made to facilitate the rendition of professional legal services to the client:

    (A)    between the client or the client's representative and the client's lawyer or the lawyer's representative;

    (B)    between the client's lawyer and the lawyer's representative;

    (C)    by the client, the client's representative, the client's lawyer, or the lawyer's representative to a lawyer representing another party in a pending action or that lawyer's representative, if the communications concern a matter of common interest in the pending action;

    (D)    between the client's representatives or between the client and the client's representative; or

    (E)    among lawyers and their representatives representing the same client.

TEX. R. EVID. 503(b)(1).

8

during the communication will destroy confidentiality, and communications intended to be disclosed to third parties are not generally privileged. *See id.* Further, the person who holds the privilege—the client—waives it if "the person . . . while holder of the privilege, voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged." TEX. R. EVID. 511(a)(1).

At the core of the privilege is the notion that the communications are "made for the purpose of facilitating the rendition of professional legal services." *Huie v. DeShazo*, 922 S.W.2d 920, 922 (Tex. 1996). As described above, the attorney–client privilege is intended to encourage clients to provide counsel with "full and frank" disclosures so that the resulting legal advice is accurate and helpful, "thereby promot[ing] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Without the privilege, clients may withhold information, limiting the effectiveness of legal representation. With candid communication, attorneys can provide optimal legal representation, and clients can obtain the advice they need. However, the mere copying of legal counsel, in and of itself, does not transform an otherwise nonlegal communication into one made for a legal purpose. *See* Tex. Att'y Gen. Op. No. JC–0233, at 6 (2000).

## B. Kroll as a Lawyer's Representative

Whether Kroll qualifies as a "lawyer's representative" is at the heart of most of Franklin's challenges to the privilege's applicability. If Kroll does not so qualify, then the disputed documents in category 2—

the interview questions and notes created by Kroll during Kroll's interviews of UT System and UT Austin employees and officials—do not qualify for the privilege in the first instance,[6] and the System waived the privilege as to the other two categories of documents—which involved internal emails and draft communications between UT System and UT Austin lawyers and clients—by sharing them with Kroll.

Rule 503 defines "lawyer's representative" as "one employed by the lawyer to assist in the rendition of professional legal services." TEX. R. EVID. 503(a)(4)(A). The definition itself confirms that one does not qualify as a lawyer's representative merely by incidentally providing such assistance in the course of employment. *Id.* Rather, assisting in the rendition of professional legal services must be a significant purpose for which the representative was hired in the first instance. This is consistent with the privilege's general applicability to communications between qualified persons if obtaining legal assistance is "one of the significant purposes" of the communication. RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 72 reporter's note cmt. c (AM. L. INST. 2000) ("In general, American decisions agree that the privilege applies if one of the significant purposes of a client in communicating with a lawyer is

---

[6] To the extent Franklin argues that Kroll's interview notes do not qualify as "communications," we disagree. *See Upjohn*, 449 U.S. at 386 (holding that communications between corporate employees and general counsel during an internal investigation of "questionable payments" by the corporation, including general counsel's questionnaires sent to employees and notes of interviews reflecting their responses to the questions, were protected by the attorney–client privilege); *see also* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 69 cmt. h (AM. L. INST. 2000) (the privilege "applies both to communications when made and to confidential records of such communications, such as a lawyer's note of the conversation").

10

that of obtaining legal assistance."); *see also In re Fairway Methanol LLC*, 515 S.W.3d 480, 489 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding) (holding that Texas law "does not require that the *primary* purpose of the communication be to facilitate the rendition of legal services; it only requires that the communication be made to facilitate the rendition of legal services").

In support of its assertion that Kroll acted as a "lawyer's representative," the System provided the Agreement between itself and Kroll, the Kroll Report, the privilege log, and affidavits from Sharphorn, Chancellor McRaven, and Assistant General Counsel Ana Vieira Ayala. We describe this evidence in detail below.

### 1. The Evidence

The Agreement between the System and Kroll reflects that Kroll's investigation was to "be conducted under the direction of the U.T. System General Counsel [Sharphorn]" and that its purpose was "to determine if the conduct of U.T. officials is beyond reproach."[7] More specifically, the investigation's objective was to ascertain whether UT Austin's admissions decisions were "made for any reason other than an applicant's individual merit as measured by academic achievement and officially established personal holistic attributes, and if not, why not." Additionally, the Agreement obligated Kroll to identify "[a]ny competing

---

[7] Scott C. Kelley, the System's Executive Vice Chancellor for Business Affairs, signed the Agreement on the System's behalf. The second and third amendments to the Agreement were "[a]pproved as to content" by Sharphorn. The fourth amendment was "[a]pproved as to content" by James M. Phillips as "Senior Associate General Counsel and Managing Attorney."

evidence or premise as to the basis for admissions . . . so it can be openly debated." The Agreement further specifies that "[a] final report shall be submitted by [Kroll] to the U.T. Austin General Counsel that describes the investigation methods employed and reports [Kroll's] factual findings." Finally, the Agreement contains detailed confidentiality provisions obligating Kroll, among other things, to "hold University Records in confidence" unless disclosure is otherwise authorized by the Agreement, the System, or applicable law, as well as to maintain the confidentiality of all materials "prepared by [Kroll] in connection with the Work." All notices and other communications provided for in the Agreement were directed to be delivered to Sharphorn.

The final Kroll Report, which was released to the public, includes the "Scope of Work" provision of the Agreement discussed above as an appendix, reiterating that Kroll's task was to investigate whether UT Austin's handling of admissions decisions was "beyond reproach" and whether admissions decisions were being made based on improper considerations. However, comprehending the nature and extent of Kroll's involvement requires a fuller understanding of the antecedent events that led to its engagement. About three months before engaging Kroll, the System had completed its own internal admissions investigation following concerns raised by the media and a member of the Board of Regents regarding possible undue influence by state legislators on UT Austin's admissions process. Nonetheless, "the focus of the inquiry was very narrow," limited only to law school admissions and "how letters of recommendation from legislators, submitted outside of the normal application process, [were] handled and processed." Only

after Sharphorn had conducted several interviews and made significant progress in the investigation did the System decide to expand the focus of the inquiry to include undergraduate admissions. As a result, the majority of Sharphorn's internal investigation was "narrowly focused on what the President's Office did with letters of recommendation."

Sharphorn concluded that there was no evidence of a "quid pro quo in exchange for admissions decisions," no evidence "of a systematic, structured, or centralized process of reviewing and admitting applicants recommended by influential individuals," and no evidence of overt pressure on the admissions office staff to admit applicants based on the recommendations of persons of influence.

However, after the internal investigation was completed, new information surfaced regarding UT Austin's handling of external pressures on admissions that led Chancellor Cigarroa to conclude it was necessary to retain an independent firm "to more thoroughly and comprehensively review the admissions process." Although Sharphorn's internal investigation had been primarily concerned with law school admissions and recommendation letters, the Board of Regents "subsequently authorized the investigation with particular focus on the undergraduate program, the law school, and the graduate business school." Chancellor Cigarroa also had concerns regarding the candor and honesty of university officials during the internal investigation, prompting his "request[] that Kroll also examine whether the university officials interviewed during the prior Admissions Inquiry were fully candid and honest in response to the questions asked of them by Dan Sharphorn." Specifically "[o]f concern was the fact that, during the

[internal investigation], there were no disclosures [to Sharphorn] of 'holds' and 'watch lists.'"

In conducting its investigation, Kroll "maintained consistent and open communication with the UT-System General Counsel, the General Counsel of UT-Austin, the General Counsel for the Board of Regents, and other appropriate designees as needed to facilitate the investigation and cooperation of all parties." Further, Kroll "acted under the direction of [Sharphorn]." The investigation included a "review [of] specific state laws, court decisions, administrative rules, Board of Regents Rules, and official university policies that govern the admissions processes," which provided the necessary backdrop for Kroll's examination of the university's admissions practices.

Ultimately, Kroll concluded that practices involving "hold lists" and meetings between the president's office and the admissions office "result[ed] each year in certain applicants receiving a competitive boost or special consideration." However, as noted, Kroll determined that UT Austin "appears to have violated no law, rule, or policy (with the possible exception of the prohibition against legacy admissions)."

Sharphorn prepared an affidavit in which he attested that he hired Kroll to conduct an independent investigation into concerns raised about UT Austin's admissions practices. Sharphorn highlighted that the focus of Kroll's investigation was on the conduct of UT officials and employees in performing admissions services, not on external recommenders. He stated that he advised Kroll at the outset of the investigation "to notify [Sharphorn] if anything came to light that raised any serious concerns, such as evidence of a quid pro quo or a threat from

14

a recommender," and that Kroll never reported any such concerns. He further stated that when Kroll presented the final report, Chancellor McRaven reviewed the results and notified the System's Board of Regents by letter of his decision that UT Austin's President "would not be subject to disciplinary action because Kroll reported that there was no violation of law, rule, or policy, and the Chancellor determined that his conduct did not rise to the level of willful misconduct or criminal activity." Sharphorn attested that Chancellor McRaven also convened a Blue Ribbon Panel of former chancellors and university presidents to review UT Austin's admissions process in light of the Kroll Report and its recommendations. Ultimately, the Board of Regents adopted a new admissions policy.

Chancellor McRaven's affidavit similarly described his receipt of the Kroll Report and the actions he took in response. In the affidavit, Chancellor McRaven averred that after reading the report several times, he "sought legal advice" from Sharphorn and, "[a]fter careful review and consideration," sent the above-referenced letter to the Board of Regents rendering his decision that UT Austin's president would not be subject to disciplinary action "because Kroll reported that there was no violation of law, rule, or policy, and I, therefore, determined that his conduct did not rise to the level of willful misconduct or criminal activity." Chancellor McRaven then described the panel he appointed to analyze the Kroll Report's recommendations and the report issued by the panel.

Finally, Ayala's affidavit highlighted that Kroll acted under Sharphorn's direction and emphasized the confidentiality provisions in the Agreement. Ayala also averred that the communications listed in

15

the privilege log "were all made for the purpose of facilitating the rendition of professional legal services" and "were not intended to be disclosed to third parties other than those to whom disclosure was made to further the rendition of professional legal services."

## 2. Analysis

In analyzing the relationship between the System and Kroll, we focus on the formation of the relationship and the purpose of Kroll's engagement at the time of employment. The terms of the engagement agreement and the surrounding circumstances guide our inquiry. We hold that, collectively, the Agreement, privilege log, and Kroll Report demonstrate that Kroll was (1) "employed by" Sharphorn (2) "to assist in the rendition of professional legal services." Thus, Kroll was acting as a "lawyer's representative" as that term is defined in Rule 503. As discussed below, the affidavits merely confirm this conclusion, and Franklin's arguments to the contrary are unpersuasive.

First, Franklin asserts that Kroll is an independent contractor and not an agent of the System. To the extent Franklin contends that a "lawyer's representative" is limited to a person with whom a lawyer or client has a formal employer–employee relationship, we disagree. The rule does not expressly define the term "employed," so we look to its ordinary meaning unless the text and context indicate a different one. *Melden & Hunt, Inc. v. E. Rio Hondo Water Supply Corp.*, 520 S.W.3d 887, 893 (Tex. 2017); *see also In re Silver*, 540 S.W.3d 530, 534 (Tex. 2018) (noting that we interpret rules in the same manner as statutes).

Black's Law Dictionary defines "employ" as "to make use of; to hire; to use as an agent or substitute in transacting business; to

16

commission and entrust with the performance of certain acts or functions or with the management of one's affairs." *Employ*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Employ*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (11th ed. 2003) ("to make use of," "to use or engage the services of," or "to provide with a job that pays wages or a salary"). Kroll qualifies as "employed by" Sharphorn under this plain meaning. Sharphorn, as Vice Chancellor and General Counsel for the System's Office of General Counsel, attested that he "hired" Kroll to investigate UT Austin's admissions practices, and the evidence is undisputed that Kroll conducted its investigation under Sharphorn's direction. Further, Kroll was contractually obligated to maintain the confidentiality of records that it created, had access to, or received from or on behalf of the System unless otherwise authorized by the university or required by law.

Nothing in the rule indicates that a formal employer–employee relationship is envisioned or required. The focus of the privilege is on the purpose and confidentiality of the communications, rather than the formal title or classification of the "lawyer's representative" as an employee, agent, independent contractor, consultant, or any other designation. *See* TEX. R. EVID. 503(a)(4); *see also* 1 Paul R. Rice et al., ATTORNEY–CLIENT PRIVILEGE IN THE U.S. § 4:19 (2022) ("If the consultant was directed by the client to communicate with the client's attorney, and it was clear to the consultant that those communications were for the purpose of obtaining legal advice, and therefore, were confidential, the extension of the privilege's protection would place neither the client, the consultant, nor the attorney in a position different

17

than they would have been in had the consultant been a 'permanent' employee."). Accordingly, we turn to the crux of the definition and whether Kroll was hired "to assist in the rendition of professional legal services." TEX. R. EVID. 503(a)(4). We conclude that it was.

Franklin places an undue emphasis on formalistic language, insisting that the engagement agreement between Kroll and the System must use specific terminology. According to Franklin, because the Agreement does not explicitly mention legal advice or legal services, Kroll cannot be considered a lawyer's representative. However, as previously noted, the key factor in determining whether a party falls within the definition of a "lawyer's representative" is not the formalities of the contract but rather the substance of the work the representative was hired to perform and its relation to the provision of legal advice. Therefore, we must look beyond the surface language used in the contract and instead evaluate the actual scope of Kroll's work.

Again, Kroll was hired to conduct "an evaluation of the conduct of U.T. . . . officials and employees in performing admissions services" and to "determine if the conduct of U.T. officials is beyond reproach." Specifically, Kroll was to determine whether "admissions decisions are made for any reason other than an applicant's individual merit . . . and if not, why not." That included a directive to notify Sharphorn promptly of any "evidence of a quid pro quo or a threat from a recommender." The phrase "beyond reproach" is not a superficial or empty expression; it is a guiding principle that reflects the school's commitment to legal

18

compliance, ethical responsibility, and professional accountability.[8] In the context of admissions practices, the phrase "beyond reproach" embodies the notion of legal compliance as a necessary component.[9] Thus, the scope of Kroll's work encompasses an assessment of the university's legal compliance, as well as a consideration of best practices and ethical standards essential to maintaining the integrity of the admissions process. Although the Agreement does not use the phrase "legal advice," "legal assistance," or the like, no such magic words are required.[10] *See Paxton*, 509 S.W.3d at 260; Tex. Att'y Gen. Op. No. JC–

---

[8] *Reproach*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Criticism, blame, or disapproval"); *Above Reproach*, BURTON'S LEGAL THESAURUS (6th ed. 2021) ("Above suspicion, blameless, faultless, guiltless, incontestable, inculpable, indisputable, indubitable, innocent, irrefragable, irrefutable, irreprehensible, irreproachable, noncontroversial, sinless, unanswerable, unblamable, uncensorable, . . . unguilty, . . . with clean hands"); *Be above/beyond reproach*, CAMBRIDGE DICTIONARY ("To not deserve any blame").

[9] The Kroll Report confirms that the phrase "beyond reproach" includes legal compliance as a necessary component. In performing its "analysis of applicable laws and policies," Kroll "obtained and analyzed applicable rules of conduct based in state law (i.e., Texas Constitution, Texas Education Code), Rules of the UT-System Board of Regents, and official policies of UT-System and UT-Austin," and it drew conclusions about UT Austin's compliance with those laws, rules, and policies. The report also notes that Kroll conducted a "Best Practices Review" by researching and consulting with experts in the field of university and graduate school admissions. The report thus demonstrates that Kroll's role included both legal compliance as well as the broader considerations of best practices and ethical standards.

[10] Although the dissent acknowledges that "magic words aren't required," *post* at 25 (Devine, J., dissenting), it simultaneously criticizes the Agreement for failing to "parrot[] Rule 503's definition of a lawyer's representative" and not mentioning the attorney–client privilege. *Id.* at 12–13. The dissent further faults the Agreement's confidentiality provisions as being essentially limited to maintaining student privacy. *Id.* Such a narrow

0233, at 6 (2000). By striving to be "beyond reproach," the System states a goal that incorporates and also goes beyond legal compliance.

The Kroll Report further demonstrates that evaluating the university's compliance with applicable law and policy was a significant and inseparable part of the investigation, not, as the dissent asserts, an "incidental" byproduct. *Post* at 18 n.50 (Devine, J., dissenting). It appears undisputed that Sharphorn's initial internal investigation was for the purpose of evaluating and advising the System about its legal compliance, and no assertions have been made that the communications underlying that investigation are not privileged. When new allegations from a former admissions official exposed potential shortcomings in that investigation, Kroll was engaged to conduct a more thorough review of the admissions process as part of ongoing efforts to ensure legal compliance. The decision to engage an independent firm indicates

view overlooks the comprehensive nature of the confidentiality provisions throughout the Agreement. For instance, Paragraphs 7.1 through 7.4 require Kroll to maintain the confidentiality of all materials it prepared in connection with the work. Those provisions work in conjunction with Paragraph 12.11, which specifically addresses the confidentiality of materials that the System shared with Kroll. Thus, the former provisions ensure confidentiality for category 2 materials, while the latter ensures confidentiality for categories 1 and 3 materials. Finally, Paragraph 9 mandates Kroll to promptly inform the University of any requests or subpoenas related to project information "so that [the System] may seek from a court of competent jurisdiction a protective order or other appropriate remedy to limit the disclosure." This provision mirrors the very action taken by the System here—namely, seeking remedies to restrict disclosure in the ongoing PIA suit. The absence of explicit language mentioning the attorney–client privilege is immaterial to the parties' intent to keep the communications confidential, as is required for the privilege to apply.

continuing concern about both the legal and ethical ramifications of the alleged conduct and an effort to ensure a comprehensive investigation was conducted.

Again, Kroll reviewed applicable statutes, rules, and court decisions and ultimately concluded that no law, rule, or policy was violated. That Kroll engaged in this analysis shows that investigating facts underlying UT Austin's compliance—or lack thereof—with laws, rules, and policies was a significant component of what Kroll was hired to do. By gathering truthful and complete information, Kroll played an indispensable role in enabling Sharphorn to provide a proper legal assessment on how to proceed. Moreover, the concern that Sharphorn's initial internal investigation had not uncovered the full extent of the problem underscores Kroll's role as a lawyer's representative.

Franklin and the dissent argue that the affidavits provided by the System are conclusory and thus provide no support for the conclusion that Kroll was hired to assist with the rendition of legal services. For example, Franklin focuses on a paragraph of Ayala's affidavit that largely parrots the privilege by stating that "[t]he communications listed in [the privilege log] were all made for the purpose of facilitating the rendition of professional legal services" and were intended to be kept confidential. We need not rely on such statements to conclude that Kroll acted as a lawyer's representative.[11]

---

[11] Moreover, in concluding the Ayala affidavit is "conclusory in all material respects," the dissent downplays the specificity and detail present in the affidavit. *Post* at 21 (Devine, J., dissenting). While not sufficient in and of itself to establish the privilege's applicability, Ayala's affidavit goes beyond a

And while the affidavits were prepared after the fact—as are most affidavits prepared in the litigation context—they are still probative to the extent they shed light on the formation of the relationship between the System and Kroll and the purposes for which Kroll was hired. In short, the Agreement, the Kroll Report, and the affidavits[12] all provide facts underlying Kroll's status as a legal representative, including the reasons it was hired and the scope of the investigation, which involved an assessment of legal compliance. *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 224 (Tex. 2004) (examining whether a corporate representative's affidavit set forth the factual basis for the attorney–client privilege's applicability). The evidence further establishes that Kroll took direction from Sharphorn, who was intended to and did serve as the System's primary contact with Kroll during the investigation, and that the parties intended to keep the materials created and reviewed by

---

mere repetition of the privilege. It discusses specific numbered documents in the privilege log, including names of individuals involved and the purpose of those documents. It also states that it was the regular practice of the organization to maintain confidentiality and restrict communications to attorneys and their representatives. Such a statement reflects an awareness of established protocols and procedures within the organization.

Expecting the affidavits to provide a comprehensive account of privileged communications would undermine the very essence of the privilege. Affidavits supporting a privilege claim must strike a delicate balance between providing enough information to establish the existence of a privileged communication while preserving confidentiality.

[12] The dissent criticizes Sharphorn's affidavit because it "was prepared in connection with other litigation." *Id.* at 22 n.60. The fact that the affidavit was prepared in the context of another case is immaterial to whether it sheds light on the issue presented.

Kroll confidential. The evidence thus goes well beyond conclusory legal assertions that Kroll qualified as a lawyer's representative.

We therefore hold that the evidence conclusively demonstrates that Kroll was "employed by [the System's] lawyer to assist in the rendition of professional legal services" and that the communications between Kroll and the System in the course of Kroll's investigation were "made for the purpose of facilitating the rendition of professional legal services" to the System. TEX. R. EVID. 503(b)(1)(A). Taken together, the Agreement, privilege log, Kroll Report, and affidavits show that the System, through Sharphorn, sought assistance from Kroll to better assess its legal obligations and potential liabilities—the exact behavior the privilege seeks to encourage. *See E.I. DuPont*, 136 S.W.3d at 223; *Paxton*, 509 S.W.3d at 260. Accordingly, and for the additional reasons discussed below, the disputed communications involving Kroll fall within the scope of the attorney–client privilege, and disclosure of otherwise privileged communications to Kroll did not result in a waiver of the privilege.

### C. Impact of Public Disclosure of the Kroll Report

Franklin also argues that, because the System publicly disclosed the Kroll Report, the underlying documents do not qualify as "confidential communications" protected by the privilege; alternatively, Franklin argues that the System waived the privilege with respect to those documents by disclosing the report. As to the first argument, a communication is not confidential if it was intended to be disclosed to third persons at the time it was made. *See* TEX. R. EVID. 503(a)(5). Here, the System does not dispute that it planned to publish the final Kroll

23

Report all along. The "Scope of Work" provision in the Agreement envisioned such publication, stating that information "that could be used to identify a student and derived from FERPA Records will be protected accordingly and will not be disclosed as part of the investigators' Final Report." Additionally, the Agreement explicitly stated that the investigation's purpose, in part, was to identify "[a]ny competing evidence or premise as to the basis for admissions . . . so it can be openly debated."

However, the record is devoid of any evidence that the System intended to publicly release the underlying documents when it provided them to Kroll or authorized him to create additional records. To the contrary, as discussed, the Agreement required Kroll to maintain the confidentiality of information obtained during the investigation. Disclosure of the Kroll Report itself, even assuming such disclosure was planned from the outset, does not by itself strip all underlying communications of their "confidential" status or amount to a wholesale waiver of the privilege as to those documents.

It is possible, however, that publication of the Kroll Report resulted in a limited waiver with respect to some of the underlying communications. The holder of a privilege waives the privilege if he "voluntarily discloses or consents to disclosure of *any significant part of the privileged matter* unless such disclosure itself is privileged." TEX. R. EVID. 511(a)(1) (emphasis added). The System argues that the information published in the Kroll Report relays only the investigators'

24

factual findings, which would not have been privileged to begin with.[13] But the report contains quotes that may or may not have been from emails and interviews that are listed in the privilege log—the only documents still in dispute. And even where the Kroll Report does not directly quote from documents, there may still be disclosure sufficient to trigger a waiver if the report unambiguously refers to and describes any of the documents in dispute.

*Category 1 Documents: Internal Attorney–Client Emails Shared with Kroll*

The first category of documents in dispute includes emails, dated before the commencement of the Kroll investigation, containing internal communications between UT System and UT Austin lawyers and clients regarding legal matters. These internal communications, which the System maintains are privileged attorney–client communications, were provided to Kroll by the System during the investigation. Franklin does not dispute that these emails were initially privileged and asserts only that the privilege was waived when they were disclosed to Kroll.[14]

---

[13] The System concedes that publication of the legal advice would result in a waiver, and we agree.

[14] The privilege log describes each of these emails as a confidential communication made for the purpose of giving or receiving legal advice. The majority of the emails were authored by or addressed to a UT System or UT Austin attorney. Only four emails—UTS-00120, UTS-00138, UTS-00143, and UTS-00146—were neither authored by nor addressed to a UT attorney. However, those four emails reflect communications between nonlegal management personnel discussing or transmitting the legal advice given by UT's legal counsel. The privilege attaches to "confidential communications made to facilitate the rendition of professional legal services to the

25

The Kroll Report broadly summarizes the emails that Kroll reviewed, and, in some instances, the report contains quotes or very specific paraphrases of the emails. It is clear that at least some of these quoted or paraphrased emails are not included in the representative sample at issue and thus are not sought by Franklin. For example, the report discusses a 2009 email, but none of the emails in the privilege log are from 2009. The report also discusses a 2010 email from a former admissions official, but the only 2010 emails in the privilege log were authored by Francie Fredrick, a UT attorney.

However, we cannot say definitively that none of the quoted or paraphrased emails are listed in the privilege log. Whether any of those communications were listed in the privilege log and disclosed in "significant part" are matters for the trial court to determine in the first instance on remand.

*Category 2 Documents: Kroll's Interview Notes*

The second category of documents includes "[t]yped and handwritten notes by Kroll . . . summarizing privileged interviews by Kroll of UT System and UT Austin employees, as well as UT System Regents, for the purpose of giving or receiving legal advice by UT System General Counsel." In the course of its investigation, Kroll conducted

---

client . . . *between the client's representatives or between the client and the client's representative.*" TEX. R. EVID. 503(b)(1)(D) (emphasis added). Thus, to the extent that discussions between management personnel concerned legal advice given by UT's counsel, the privilege attaches. In any event, as noted, Franklin does not dispute that the underlying documents were privileged in the first instance. Instead, it asserts that the *sharing* of otherwise privileged documents with Kroll waived the attorney–client privilege.

over sixty interviews of UT officials and employees. The Ayala affidavit describes the interview questions and notes as "captur[ing] confidential communications between Kroll, an attorney representative, and clients."

The System contends that the privilege covers Kroll's notes created during the employee interviews conducted in connection with the investigation. We agree. When a lawyer or lawyer's representative memorializes confidential communications made by the client or client's representative in the course of developing facts that will enable the lawyer to give sound legal advice, those communications are protected by the attorney–client privilege. *Upjohn*, 449 U.S. at 390–91; *see also Huie*, 922 S.W.2d at 923 (noting that while "a person cannot cloak a material fact with the privilege merely by communicating it to an attorney," the *attorney* may not reveal the fact if he learned it through a confidential communication from the client). As discussed, Kroll was acting as a lawyer's representative, assisting in the rendition of professional legal services in conducting and memorializing the interviews. Therefore, the privilege covers Kroll's interview notes and questions provided that the privilege was not waived.

Whether the privilege was waived as to Kroll's notes documenting a particular interview again depends on whether the Kroll Report disclosed "any significant part" of the document. TEX. R. EVID. 511(a)(1). Most of the information reported in Section 5 ("Review of Undergraduate Admissions") of the Kroll Report was based on these interviews. Moreover, there are several instances within the report where the content of these documents is revealed, as the report specifically quotes

27

or paraphrases from individuals Kroll interviewed.[15]   On remand, the trial court should determine in the first instance whether the report's descriptions of portions of a particular communication in this category amounted to disclosure of a "significant part" of the communication and thus waived the privilege as to that communication.

*Category 3 Documents: Draft Communications from Sharphorn to UT Employees That Were Shared with Kroll*

The last category of documents includes draft correspondence from Sharphorn to UT employees that the Ayala affidavit describes as

_____

[15] For example, the report includes the following statements:

- Several UT Austin and UT System officials Kroll interviewed believed that, absent a specific rule or policy prohibiting certain considerations, there is nothing particularly inappropriate with the president of a university essentially overriding preliminary admissions decisions.

- As one high level UT Austin official told Kroll, that there is "outside influence" should come as no surprise, but the president is effectively the CEO of the university and is accountable to many stakeholders.  It is his or her job to balance those interests and occasionally make judgment calls on admissions.

- During interviews of key officials, Kroll learned . . . [i]n the case of one official at UT System, while the official's son was in the process of applying to the undergraduate program, the official called Nancy Brazzil and said, "I just want you to know my . . . son is applying to the university."  Brazzil replied, "OK, we'll take care of that." Although this official noted that, in hindsight, this had the appearance of exerting influence, he insisted that there was no such intent to pressure or influence UT Austin in its admissions decision.  Nevertheless, the son was admitted.

28

"drafts of communications that were to be sent to UT clients (employees and/or officials) by UT System General Counsel about cooperation with Kroll during the investigation." The System argues that the privilege extends to draft documents and communications, whereas Franklin asserts that draft communications are not "communications" within the meaning of the privilege. In light of the evidence that Sharphorn in fact communicated with UT employees and officials about cooperating with Kroll, the draft correspondence at least served as an outline of what Sharphorn intended to discuss with his client and thus fits within the scope of the privilege. *See United States v. DeFonte*, 441 F.3d 92, 96 (2d Cir. 2006); *Fair Isaac Corp. v. Tex. Mut. Ins. Co.*, No. H-05-3007, 2006 WL 3484283, at *2 (S.D. Tex. Nov. 30, 2006) ("The attorney–client privilege also applies to notes that are not themselves communications if disclosure would reveal the substance of any confidential communications between the attorney and client that were made in the course of seeking or giving legal advice." (citation and internal quotation marks omitted)).

Although the Kroll Report acknowledges that UT employees cooperated with Kroll during the investigation, there is no mention of any underlying documents or communications—draft or otherwise—regarding such cooperation. We hold that the privilege was not waived as to these draft communications.

## III. Conclusion

For the foregoing reasons, we hold that Kroll was a lawyer's representative, that the documents identified in the privilege log were intended to be kept confidential, and that the attorney–client privilege

29

attached to those documents.  Further, the publication of the Kroll Report did not constitute a wholesale waiver of the privilege as to all documents reviewed or prepared by Kroll.  However, the report's publication may constitute a waiver as to some of those documents to the extent it revealed a "substantial part" of any of them.  Because the System's privilege log contains only a "representative sample" of the thousands of documents provided to Kroll, the trial court is the appropriate forum to determine in the first instance whether the Kroll Report is quoting from or describing documents within that sample and, if it is, whether the report discloses a "significant part" of any of those documents.  Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 30, 2023